[No. 41612. En Banc. July 8, 1971.]

WILLIAM JAMES McCUTCHEON *et al., Petitioners,* v. UNITED HOMES CORPORATION, *Respondent.*

DOUGLAS R. FULLER *et al., Petitioners,* v. UNITED HOMES CORPORATION, *Respondent.*

*McMullen, Brooke, Knapp & Grenier,* by *Robert E. Brooke,* for petitioners.

*Elvidge, Veblen & Tewell,* by *Thomas A. St. Pierre,* for respondent.

STAFFORD, J.—The two cases involved herein were considered separately by the trial court. Since the issues presented are identical, they have been consolidated on appeal.

Plaintiff Norma McCutcheon, a tenant of defendant United Homes Corporation, was injured one evening when she fell down an unlighted flight of stairs leading from her apartment. She alleged the defendant was negligent because the lights at the top and bottom of the stairwell were not operative.

Plaintiff Douglas R. Fuller, also defendant's tenant, was injured as he descended the outside stairs of his apartment on his way to work. A step pulled loose causing him to fall. He, too, alleged negligence on the part of defendant.

Defendant's answer alleged each plaintiff had executed a form "Month to Month Rental Agreement" which contained the following exculpatory clause:

neither the Lessor, nor his Agent, shall be liable for any injury to Lessee, his family, guests or employees or any

other person entering the premises or the building of which the demised premises are a part.

In each case the trial court granted a summary judgment of dismissal.

The question is one of first impression. The issue is whether the lessor of a residential unit within a multi-family dwelling complex may exculpate itself from liability for personal injuries sustained by a tenant, which injuries result from the lessor's own negligence in maintenance of the approaches, common passageways, stairways and other areas under the lessor's dominion and control, but available for the tenants' use. (Hereinafter called the "common areas".)

Basic to the entire discussion is the common law rule that one who leases a portion of his premises but retains control over the approaches, common passageways, stairways and other areas to be used in common by the owner and tenants, has a duty to use reasonable care to keep them in safe condition for use of the tenant in his enjoyment of the demised premises. *Schedler v. Wagner,* 37 Wn.2d 612, 225 P.2d 213, 230 P.2d 600 (1950); Restatement (Second) of Torts § 360, at 250 (1965). The landlord is required to do more than passively refrain from negligent acts. He has a duty of affirmative conduct, an affirmative obligation to exercise reasonable care to inspect and repair the previously mentioned portions of the premises for protection of the lessee. W. Prosser, Handbook of the Law of Torts § 38, at 183, § 80, at 471 (2d ed. 1955); F. Harper, A Treatise on the Law of Torts § 68, at 158, § 79, at 197, § 82, at 207, § 103, at 236 (1933); F. Harper and F. James, 2 The Law of Torts § 27.17, at 1516 *et seq.* (1956).

It is readily apparent that the exculpatory clause was inserted in defendant's form "Month to Month Rental Agreement" to bar its tenants from asserting actions for personal injuries sustained through the landlord's own negligence. It was adopted to negative the result of the lessor's failure to comply with its affirmative duty to the tenants.

The defendant asserts that a lessor may contract, in a

rental agreement, to exculpate itself from liability to its lessee, for personal injuries caused by lessor's own negligence. 49 Am. Jur. 2d *Landlord and Tenant* § 869, at 837 (1970). It contends such exculpatory clauses are not contrary to public policy because the landlord-tenant relationship *is not a matter of public interest, but relates exclusively to the private affairs of the parties concerned and that the two parties stand upon equal terms. Thus, there should be full freedom to contract.* 49 Am. Jur. 2d *Landlord and Tenant* § 870, at 839 (1970); Annot., 175 A.L.R. 8, 86 (1948). Defendant suggests there is additional case support in this jurisdiction by citing *Broderson v. Rainier Nat'l Park Co.*, 187 Wash. 399, 60 P.2d 234 (1936) and *Griffiths v. Broderick, Inc.*, 27 Wn.2d 901, 182 P.2d 18, 175 A.L.R. 1 (1947).

The impact of *Broderson* and *Griffiths* shall be dealt with summarily. *Broderson* was overruled by this court subsequent to the Court of Appeals' decision in this case. *See Baker v. Seattle*, 79 Wn.2d 198, 484 P.2d 405 (1971). *Griffiths* deals strictly with the validity of a contract of *indemnity* and is not in point.

 The importance of "freedom of contract" is clear enough. However, the use of such an argument for avoiding the affirmative duty of a landlord to its residential tenant is no longer compelling in light of today's multifamily dwelling complex wherein a tenant merely rents some space with appurtenant rights to make it more usable or livable. Under modern circumstances the tenant is almost wholly dependent upon the landlord to provide reasonably for his safe use of the "common areas" beyond the four walls demised to him. Quinn and Phillips, *The Law of Landlord-Tenant*, 38 Fordham L. Rev. 225, 231 (1969).

As early as 1938 Williston recognized that while such exculpatory clauses were recognized as "legal", many courts had shown a reluctance to enforce them. Even then, courts were disposed to interpret them strictly so they would not be effective to discharge liability for the consequences of negligence in making or failing to make repairs.

6 Williston, A Treatise on the Law of Contracts § 1751C, at 4968 (Rev. ed. 1938). In § 1751B, at 4965, the author said:

A promise not to sue for the future damage caused by simple negligence may be valid. *Such bargains are not favored,* however, and, if possible, bargains are construed not to confer this immunity.

(Footnotes omitted. Italics ours.)

The key to our problem is found in Restatement of Contracts § 574, at 1079 (1932) which reads:

A bargain for exemption from liability for the consequences of negligence *not falling greatly below the standard established by law* for the protection of others against unreasonable risk of harm, is legal . . .

(Italics ours.) In other words, such an exculpatory clause may be legal, when considered in the abstract. However, when applied to a specific situation, one may be exempt from liability for his own negligence *only when the consequences thereof do not fall greatly below the standard established by law.*

■ In the landlord-tenant relationship it is extremely meaningful to require that a landlord's attempt to exculpate itself, from liability for the result of its own negligence, *not fall greatly below the standard of negligence set by law.* As indicated earlier, a residential tenant who lives in a modern multi-family dwelling complex is almost wholly dependent upon the landlord for the reasonably safe condition of the "common areas". However, a clause which exculpates the lessor from liability to its lessee, for personal injuries caused by lessor's own acts of negligence, not only lowers the standard imposed by the common law, it effectively *destroys* the landlord's affirmative obligation or duty to keep or maintain the "common areas" in a reasonably safe condition for the tenant's use.

When a lessor is no longer liable for the failure to observe standards of affirmative conduct, or for *any* conduct amounting to negligence, by virtue of an exculpatory clause in a lease, *the standard ceases to exist.* In short, such a clause *destroys* the concept of negligence in the

landlord-tenant relationship. Neither the standard nor negligence can exist in abstraction.

It is no answer to argue that the rental agreement relates exclusively to the "personal and private affairs of two parties on equal footing" and thus is "not a matter of public interest." Such a concept had its origin in contracts entered into between *indemnitors* and *indemnitees*. *Woodbury v. Post*, 158 Mass. 140, 33 N.E. 86 (1893); *Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907). The theory was first carried from *indemnity* contracts into the landlord-tenant relationship by the Pennsylvania Supreme Court's rather cursory consideration of mere dicta in *Perry v. Payne, supra*. In *Cannon v. Bresch,* 307 Pa. 31, 35, 160 A. 595 (1932),[1] the court first used the language now relied on by defendant, applying it to an exculpatory clause concerned with *property damage* arising out of a lease for business purposes:[2]

> It is a contract between persons conducting a strictly private business and relates entirely to their personal and private affairs, and so cannot be opposed to public policy. It would seem to be a matter of no interest to the public or the State.

See Arensberg, *Limitation by Bailees and by Landlords of Liability for Negligent Acts*, 51 Dick. L. Rev. 36 (1946).

The foregoing cases and their progeny actually form the basis for the so-called "majority rule" cited in 49 Am. Jur. 2d *Landlord and Tenant* § 870, at 839 (1970) and Annot., 175 A.L.R. 8, 83-92 (1948). It is safe to say, however, that there is no true majority rule. There are only numerous conflicting decisions, decisions concerned with contracts of indemnity, cases relating to property damage under business leases, and a disposition of the courts to emasculate

---

[1] *Cannon v. Bresch*, 307 Pa. 31, 160 A. 595 (1932) also cited *Fera v. Child*, 115 Mass. 32 (1874). *Fera*, also a case of *property damage* arising out of a lease of property for *business purposes*, is apparently another ancestor of the Pennsylvania rule.

[2] Whether such a clause may be used in a lease of property for *business purposes* (as differentiated from residential purposes) to exculpate a landlord from the result of his own negligence in the event of *property damage* is not before the court at this time.

such exculpatory clauses by means of strict construction. Annot., 175 A.L.R. 8, 89-92 (1948); *Exculpatory Clauses in Leases of Realty in Pennsylvania*, 15 U. Pitt. L. Rev. 493, 496 (1954). From this, one can reasonably infer that even though such clauses are recognized by some courts, a great number have regarded them with disfavor. *The Effect of Exculpatory Agreements Upon Landlords' Tort Liability in Illinois*, 54 Nw. U.L. Rev. 61, 69 (1959); *Exculpatory Clauses in Leases of Realty in Pennsylvania, supra* at 501; F. Harper and F. James, 2 The Law of Torts § 21.6 (1956).

■ It is inaccurate to characterize the foregoing as a "majority rule". Furthermore, one must ignore present day realities to say that such an exculpatory clause, which relieves a lessor of liability for personal injuries caused by its own negligence, is purely a "personal and private affair" and "not a matter of public interest".

We no longer live in an era of the occasional rental of rooms in a private home or over the corner grocery. In the relatively short span of 30 years the public's use of rental units in this state has expanded dramatically. In the past 10 years alone, in the state of Washington, there has been an increase of over 77,000 rental units.[3] It takes no imagination to see that a business which once had a minor impact upon the living habits of the citizenry has developed into a major commercial enterprise directly touching the lives of hundreds of thousands of people who depend upon it for shelter.[4]

Thus, we are not faced merely with the theoreti-

[3]Bureau of the Census, 16th Census of the United States: 1940, Housing, Vol. 2, General Characteristics (1943).

Bureau of the Census, Census of Housing: 1950, Vol. 1, General Characteristics (1953).

Bureau of the Census, U.S. Census of Housing; 1960, Final Report H.C. (1)-49.

Bureau of the Census, 1970 Census of Housing, General Housing Characteristics, Advance Report (1971).

It must be noted that these figures refer to rental units and not to the number of occupants. The number of people who actually live in such units far exceeds the foregoing statistics.

[4]In recent years the law has enforced duties toward the general public, which override strict contract principals. *See* Prosser, *The As-*

cal duty of construing a provision in an isolated contract specifically bargained for by *one landlord and one tenant* as a purely "private affair."[5] Considered realistically, we are asked to construe an exculpatory clause, the generalized use of which may have an impact upon thousands of potential tenants.

Under these circumstances it cannot be said that such exculpatory clauses are "purely a private affair" or that they are "not a matter of public interest." The real question is whether we should sanction a technique of immunizing lessors of residential units within a multi-family dwelling complex, from liability for personal injuries sustained by a tenant, which injuries result from the lessor's own negligence in maintaining the "common areas"; particularly when the technique employed destroys the concept of negligence and the standard of affirmative duty imposed upon the landlord for protection of the tenant.

An exculpatory clause of the type here involved contravenes long established common law rules of tort liability that exist in the landlord-tenant relationship. As so employed, it offends the public policy of the state and will not be enforced by the courts. It makes little sense for us to insist, on the one hand, that a workman have a safe place in which to work, but, on the other hand, to deny him a reasonably safe place in which to live.

The trial court is reversed and the cause is remanded for trial.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, HALE, NEILL, and WRIGHT, JJ., concur.

---

*sault Upon the Citadel,* 69 Yale L.J. 1099 (1960); Prosser, *The Fall of the Citadel,* 50 Minn. L. Rev. 791 (1966); *see also Baker v. Seattle,* 79 Wn.2d 198, 484 P.2d 405 (1971), in which we held that the waiver of the right to sue for personal injuries, contained in a lease of chattels, requires something more than a standard recital of waiver in a rental contract.

[5]Whether a landlord and tenant may specifically enter into a bargain for an exculpatory clause in a residential rental lease, on the basis of reduced rental payment, is not before us.