This is an appeal occasioned by a Jefferson County trial court's grant of summary judgment against Patricia H. Lloyd in a tort action.
 I
The circumstances from which the conflict developed are as follows: On 1 April 1979, Patricia Lloyd, a young Birmingham woman, leased an apartment at Shadowood Circle, a residential apartment complex owned by John T. Strain. The printed form lease agreement which Lloyd signed contained the following clause:
 "As a part of the consideration hereof, the lessee hereby covenants and agrees to hold the Lessor, the Lessor's Rental Agents, and the Servants and Employees of either, free and harmless from any and all liability for claims for damages, or other claims for personal injury, or death, sustained by Lessee, or sustained by any other person, while on the leased premises or adjacent thereto during the terms of this lease as the result of negligence, or other conduct of the lessor, or of the Lessor's Servants, Agents or Employees."
Such is generally known as an "exculpatory clause." It operates to release the lessor from liability for future negligent conduct, so that he or she can negligently cause the lessee injury, yet avoid the otherwise fixed legal responsibility to compensate the lessee.
After moving into the apartment, Lloyd realized the sliding glass patio door in her apartment had been installed improperly so that the locking mechanism was operable from the outside. Also, because the door slid on the wrong runner, it did not open and shut properly. Due to this defective installation, there was an exposed and open area around the glass. Lloyd notified *Page 737 
Strain of these problems on a number of occasions, but he did not repair the door.
On 8 September 1980, Strain assigned to Service Corporation of Alabama, Inc. (Service), his leasehold rights, title, and interest in Shadowood Circle Apartments. Service began immediately to convert the apartments into condominiums, but allowed Lloyd to remain in her apartment under the preexisting lease. As part of this conversion, Service removed the draperies from almost all of the units in Lloyd's building.
On 29 September 1980, Lloyd was awakened early in the morning by a burglar. When encountered, the burglar fled as he had entered, through Lloyd's bedroom window, which he had unlocked from the outside.
Lloyd immediately reported the incident to the police. The next day she complained to Service, requesting that it take the following steps to provide security for her apartment: 1) replace her sliding glass door so that the locking mechanism could not be disengaged from the outside; 2) place screens on all the windows to prevent entrance through the apartment windows; and 3) replace the draperies in the empty units. Service did not make any of the repairs at that time, but eventually began to rehang the draperies.
During the last week of November 1980, Lloyd repeatedly observed a strange man on the premises near her apartment and reported the incidents to a deputy sheriff, who investigated the man. Lloyd notified Service employees of this investigation and asked that Service make the repairs which she had previously requested. Service did not accommodate Lloyd's requests.
On 27 December 1980, Lloyd was assaulted and raped in her apartment. The rapist entered Lloyd's apartment by disengaging the locking mechanism on the sliding glass door from the outside.
Subsequently, Lloyd filed a complaint in Jefferson County Circuit Court against Service Corporation. In her complaint, she alleges that Service was negligent in failing and refusing to repair the defective sliding glass door. She alleges that Service's negligence proximately caused the physical injury and emotional distress she suffered because she was raped. A later amendment to that complaint further alleges that Service Corporation's negligence in providing security proximately caused her injuries.
Service filed a motion to dismiss and a subsequent motion for summary judgment based upon the presence of the exculpatory clause in Lloyd's lease. After hearing oral arguments, the trial court granted summary judgment in favor of Service based on the presence of the exculpatory clause in the lease agreement. That court entered final judgment in accordance with Rule 54 (b), ARCP. Lloyd appealed to this court. She contends the trial court erred in granting summary judgment in favor of Service based on the exculpatory clause.
 II
Lloyd acknowledges, as indeed she must, that this is a request for reexamination and reconsideration of our treatment, in Alabama, of exculpatory clauses in residential leases as valid and enforceable. She contends, because such clauses are typically part of adhesive contracts, that they are not truly bargained for, and that their enforcement is against the public interest.
Service argues that modification of our present law is not needed and points to this court's strong policy in favor of freedom of contract. Service contends that change, even if needed, should be initiated by our Legislature. We have supplied ample authority to support these arguments.[1]
Exculpatory contract provisions have, in various other circumstances, been found by this court to be void on the grounds of being contrary to public policy. See Alabama *Page 738 Great So. R.R. v. Sumter Plywood Corp., 359 So.2d 1140 (Ala. 1978); Housing Authority of Birmingham District v. Morris,244 Ala. 557, 14 So.2d 527 (1943); Smith v. Kennedy, 43 Ala. App. 554, 195 So.2d 820 (1966), cert. den., 280 Ala. 718,195 So.2d 829 (1966). The rationale behind these holdings is that such clauses tend to encourage negligence and, in circumstances where there is a strong public interest to discourage negligence, the clauses should be unenforceable.
As Service Corporation notes, in Alabama, residential leases have consistently been characterized as not involving the public interest and exculpatory clauses therein as not
violative of public policy. Lloyd begs our reconsideration of this issue and our acknowledgement that, at least when not fairly bargained for between parties having substantially equal bargaining power, exculpatory clauses in residential leases are violative of public policy in Alabama.
A single, but two-pronged, issue is presented. First, whether there is, at this time, a public policy justification for modification of the law in Alabama regarding the enforcement of exculpatory clauses in residential leases. Second, whether such a change, if needed, should originate with the judiciary.
 III
The issue whether it is contrary to the public interest to allow escape from liability in a specific situation involves a complex of considerations. Among the factors we will consider and which other courts have considered in order to make such a determination regarding residential leases are: whether the service provided by the underlying contract is one necessary to the public; whether a significant number of people are compelled to seek the service; whether the transaction places one party to the contract under the control of the other and subject to his or her carelessness; the relative bargaining power of the parties and whether there is stated legislative policy against judicial enforcement of "unconscionable" contracts. See Henrioulle v. Marin Ventures, Inc., 20 Cal.3d 512, 573 P.2d 465, 143 Cal.Rptr. 247 (1978), and Weaver v.American Oil Co., 257 Ind. 458, 276 N.E.2d 144 (1971).
First, it is clear we no longer live in an era of the occasional rental of rooms in a home or over the corner store. The rental industry provides a basic necessity of life, shelter, to thousands of inhabitants of this state.[2]
Approximately 30% of the total occupied housing units in the state are rental units.[3] In Birmingham, the state's largest metropolitan area, approximately 47% of the total housing units are rental units.[4]
It requires no imagination to see that the rental industry is now a major commercial enterprise which directly touches the lives of thousands of people who depend on it for shelter. If the rental industry was small, the effect of the use of exculpatory clauses in residential leases would be minuscule. However, the existence of a large number of leases containing exculpatory clauses affects thousands of citizens who are concerned with the quality and safety of housing offered for rent in the state. See, e.g., McCutcheon v. United Homes Corp.,79 Wn.2d 443, 486 P.2d 1093, 1098 (1971).
Second, it is evident that modern residential lease transactions subject tenants to the carelessness of the landlord. That has not always been true. During the past several decades, there have been occurring important societal changes in relationships between landlords and tenants in Alabama. In the past, many Alabama tenants were farmers. In agrarian situations, land, not *Page 739 
housing, was the important part of a rental arrangement. A tenant would rent a property "as is," but he had the right to improve the dwelling.
Since simple carpentry and construction skills were part of a farmer's basic knowledge in that area, it was easy for him to make his house "livable," according to the standards of the day. He did not need to know about plumbing, electricity, elevators, or other modern necessities. In comparison, as is illustrated by Patricia Lloyd's circumstances, the modern urban tenant is almost totally dependent upon the landlord to make repairs and is vulnerable to his or her refusal to do so.
Third, the very nature and effect of the exculpatory clause makes clear the lack of bargaining power on the part of the tenant when negotiating a lease agreement. In his special concurrence in Taylor v. Leedy and Co., 412 So.2d 763, 766
(Ala. 1982), Justice Faulkner spoke to this problem:
 "Clearly, landlords have greater bargaining power than tenants in residential leases. A tenant must live somewhere. The tenant has no meaningful choices. He can accept this landlord or go to another landlord who charges the same rent and asks the tenant to sign the same standard form lease. In other words, the modern standard form lease is in essence an adhesion contract. A survey of residential leases in Alabama would show that almost all leases contain these exculpatory clauses. A reasonable person with equal bargaining power would not accept a term whereby they or their children may be injured or killed, and they would have no recourse against the guilty party. . . ."
Concern with this problem has developed because of the increasing use, in Alabama, of the standardized mass contract by business enterprises. Traditionally, a contract was the result of free bargaining of parties brought together by the play of the market, parties who met each other on a footing of approximate economic equality. Today, however, an individual consumer often faces an enterprise with strong bargaining power and position. That consumer, in need of goods or services, is frequently not in a position to shop around for better terms, because all competitors use the same clauses. Weaver v.American Oil Co., 257 Ind. 458, 276 N.E.2d 144, 147 (1971).
There is a nationwide trend for courts to refuse to enforce agreements proven to be unconscionable.[5] An unconscionable contract has been defined as one "such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." WestPoint-Pepperell, Inc. v. Bradshaw, 377 F. Supp. 154 (M.D.Ala. 1974) (quoting Hume v. United States, 132 U.S. 406,10 S.Ct. 134, 33 L.Ed. 393 (1889)).
Reflecting that general trend, our Legislature has expressed a clear concern for consumers in a situation analogous to that here considered. In § 7-2-302, Code 1975, the legislative body has mandated that the Alabama judiciary not enforce "unconscionable" clauses in sales agreements. We think it reasonable to surmise that, because our Legislature has expressed so strong a concern for the effect of unequal *Page 740 
bargaining power on sales agreements, its concern with the issue relative to the provision of the basic human need of shelter is substantially stronger.
For the above reasons we find the enforcement of "unbargained for" exculpatory clauses in residential leases against the best interests of the citizens of Alabama and contrary to public policy. We now proceed to determine whether a change in the law should be effected by the judiciary.
 IV
While the preferred method for modification of a rule of law is by legislative action, it is clearly within the power of the judiciary, and, at times, appropriate for the judiciary, to change an established rule of law. A number of factors lead this court to the conclusion that it is here appropriate.[6] We will discuss three of our primary considerations below.
First, the judiciary originally created this rule of law. It has not been altered, amended, or expanded upon by our legislative body. In this circumstance, where a judicial creation has become outmoded or unjust in application, it is more often appropriate for the judicial body to act to modify the law. Further, it is not uncommon for the Legislature to defer to the court's wisdom regarding such a rule of law. SeeJackson v. City of Florence, 294 Ala. 592, 320 So.2d 68, 73
(1975); Haney v. City of Lexington, 386 S.W.2d 738, 741 (Ky. 1964); and Holytz v. City of Milwaukee, 17 Wis.2d 26,115 N.W.2d 618, 626 (1962). McAndrew v. Mularchuk, 33 N.J. 172,193, 162 A.2d 820, 832 (1960).
Second, this is a tort law issue. An unjust tort law mayindirectly affect every citizen of the state, but it will almost never directly affect enough people at any given point in time to generate a great deal of attention. It is not likely, therefore, to be placed on the Legislature's crowded agenda for consideration. For that reason, tort law issues are, when certain other factors are present, proper subjects for judicial reform.
Last, when it has determined that a judicially created law is unjust in its application, this court cannot long permit itself to be used as an instrument of inequity by refusing to act to change the law. To do so undermines our credibility in the public perception. The judicial branch of government cannot avoid action. It must continuously apply the law to resolve the conflicts between citizens of this state. To continue to apply a judicially created rule this court has recognized as obsolete and unjust is a violation of its integrity.
In United States v. Bethlehem Steel Corp., 315 U.S. 289, 326,62 S.Ct. 581, 599, 86 L.Ed. 855 (1942), Justice Frankfurter, of the United States Supreme Court, described the judiciary's responsibility regarding this problem:
 "It is said that familiar principles would be outraged if Bethlehem were denied recovery on these contracts. But is there any principle which is more familiar or more firmly embedded in the history of Anglo-American law than the basic doctrine that the courts will not permit themselves to be used as instruments of inequity and injustice? Does any principle in our law have more universal application than the doctrine that courts will not enforce transactions in which the relative positions of the parties are such that one has unconscionably taken advantage of the necessities of the other?
 "These principles are not foreign to the law of contracts. Fraud and physical duress are not the only grounds upon which courts refuse to enforce contracts. The law is not so primitive that it sanctions every injustice except brute force and downright fraud. More specifically, the courts generally refuse to lend themselves to the enforcement of a `bargain' in which one party has unjustly taken *Page 741 
advantage of the economic necessities of the other. . . ."
For this court to continue to sanction the enforcement of exculpatory clauses in adhesive contracts and thereby encourage landlords to neglect the duties imposed on them by law for the protection of tenants is to allow itself to "be used as [an instrument] of inequity and injustice."
We think that, under these circumstances, the responsibility for modification of the law rests with this court. The enforcement of adhesive exculpatory clauses in modern residential leases where not explicitly bargained for by the parties cannot be rationally defended. In fact, it is almost incredible that we have so long allowed landlords to shift the consequences of their negligence to tenants in that manner.[7] We thus proceed to consider the manner in which the law should be modified.
 V
As above noted, our Legislature has expressed strong concern for the effect of the consumer's unequal bargaining power when purchasing goods, by enacting § 7-2-302, Code 1975. In light of that clear statement of legislative policy and this court's determination that exculpatory clauses in residential leases are violative of public policy where not "bargained for," we think it reasonable for this court to apply § 7-2-302 by analogy to lease agreements. At least one state has done so. See Weaver v. American Oil Co., 257 Ind. 458, 276 N.E.2d 144
(1971). There is authority for such treatment.[8]
Therefore, when a lessee can show that an exculpatory provision in a residential lease contract is in fact an unconscionable one, due to a prodigious amount of bargaining power on behalf of the lessor, which is used to the lessor's advantage, causing a great hardship and risk to the lessee, the contract provision, or the contract as a whole, if not separable, is void on the grounds that the provision is contrary to public policy. The lessor seeking to enforce such a contract has the burden of showing that the provisions were explained to the lessee and came to his knowledge and that there was in fact a real and voluntary meeting of the minds and not merely an objective meeting.
We do not hold that exculpatory clauses in residential leases are void per se. When clearly "bargained for," such contract provisions are enforceable and valid.
We choose not to believe that any landlord, or any of his or her agents, would commit a tort deliberately, in reliance on this court's enforcement of an adhesive exculpatory clause. Therefore, we see no particular reasons why we should not apply this modified rule of law in the instant case and permit all others who have been injured, and who are not barred by the statute of limitations, to take advantage of the rule. Our prior decisions regarding this issue are reversed only to the extent that they conflict with this holding.
The judgment of the trial court that Patricia Lloyd's cause of action is barred by the exculpatory clause in her lease agreement with Service Corporation is reversed, and this cause is remanded to that court *Page 742 
for proceedings consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
FAULKNER, JONES, BEATTY and ADAMS, JJ., concur.
MADDOX, ALMON and SHORES, JJ., dissent.
TORBERT, C.J., not sitting.
[1] See, e.g., Matthews v. Mountain Lodge Apartments, Inc.,388 So.2d 935, 938 (Ala. 1980), where this court held to precedent and declined to hold unenforceable exculpatory clauses in residential leases. One reason cited for this court's decision was deference to the Legislature, due to its superior ability "to assess the conditions of the marketplace."
[2] See, e.g., Henrioulle v. Marin Ventures, Inc., 20 Cal.3d 512,143 Cal.Rptr. 247, 573 P.2d 465 (1978); and McCutcheon v.United Homes Corp., 79 Wn.2d 443, 486 P.2d 1093 (1971), where the increase in number of renters is considered relevant regarding continued enforcement of exculpatory clauses.
[3] Based on 1980 Census of Population and Housing, Bureau of the Census, United States Department of Commerce, Washington.
[4] Id.
[5] A number of courts have refused to enforce exculpatory clauses in residential lease agreements due to lack of bargaining power by the tenant. Jackson v. First Nat. Bank,415 Ill. 453, 114 N.E.2d 721 (1953); Sweney Gasoline Oil Co. v.Toledo, P. W.R. Co., 42 Ill.2d 265, 247 N.E.2d 603 (1969);Simmons v. Columbus Venetian Stevens Bldgs., Inc.,20 Ill. App.2d 1, 155 N.E.2d 372 (1958); Strauch v. CharlesApartments Co., 1 Ill. App.3d 57, 273 N.E.2d 19 (1971); Weaverv. American Oil Co., 257 Ind. 458, 276 N.E.2d 144 (1971);Talley v. Skelly Oil Co., 199 Kan. 767, 433 P.2d 425 (1967) (by implication); Mayfair Fabrics v. Henley, 48 N.J. 483,226 A.2d 602 (1967); Kuzmiak v. Brookchester, Inc., 33 N.J. Super. 575,111 A.2d 425 (1955); Midland Carpet Corp. v. FranklinAssociated Properties, 90 N.J. Super. 42, 216 A.2d 231 (1966);Swisscraft Novelty Co. v. Alad Realty Corp., 113 N.J. Super. 416,274 A.2d 59 (1971); Cardona v. Eden Realty Co.,118 N.J. Super. 381, 288 A.2d 34 (1972); Galligan v. Arovitch421 Pa. 301, 219 A.2d 463 (1966); Employers Liability Assur. Corp.v. Greenville Business Men's Ass'n, 423 Pa. 288, 224 A.2d 620
(1966).
[6] For an excellent discussion of the relevant factors in determining the appropriate body to institute legal reform, see Comment, Reforming the Common law, 34 Ala.L.Rev. 631 (1983).
[7] It is interesting to compare with this case our abrogation of municipal immunity as against public policy in Alabama. Jacksonv. City of Florence, 294 Ala. 592, 320 So.2d 68 (1975). The widespread use of exculpatory clauses in residential lease agreements has effectively provided landlords with a similar immunity from suits for negligence.
[8] A statute may be extended by analogy, beyond its apparent boundaries, to include situations which would reasonably have been contemplated by the Legislature in light of the purposes giving impetus to the legislation. Sutherland, StatutoryConstruction, 3rd ed. (Horack) § 6005 (1943). Thus, principles of the Uniform Negotiable Instruments Law have been extended beyond the letter of the statute to non-negotiable instruments.Sheldon v. Blacman, 188 Wis. 4, 205 N.W. 486 (1925). The Court reasoned that the NIL represented codification of the law on all instruments of debt. Similarly, an Illinois statute authorizing contests of county elections was held applicable to municipal elections. Harding v. Albert, 373 Ill. 94,25 N.E.2d 32 (1939).