541 So.2d 1081 (1989)
SOUTHERN STATES FORD, INC., and Kevin Starcher
v.
Margaret Ann PROCTOR.
87-331.
Supreme Court of Alabama.
March 10, 1989.
*1082 Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, Montgomery, for appellants.
Eugene W. Reese of Reese & Addison, Montgomery, for appellee.
MADDOX, Justice.
This appeal involves a claim of misrepresentation in the sale price of an automobile. Plaintiff, Margaret Ann Proctor, bought a new 1986 Isuzu Trooper II vehicle from Southern States Ford, Inc. (hereinafter "Southern States"), and then sued Southern States and its salesman Kevin Starcher for allegedly making misrepresentations about certain charges added to the manufacturer's "sticker price" of the new vehicle. The jury awarded Proctor compensatory damages of $1,779.00 and punitive damages of $70,000.00 against both defendants, and the trial judge entered judgment accordingly. We affirm.
The evidence tends to show the following. On August 15, 1986, Proctor visited Southern States to inquire about the purchase of an Isuzu Trooper. Salesman Starcher showed Proctor the vehicle she ultimately bought, and the manufacturer's sticker on the vehicle showed the price to be $11,966.00. Even though there should have been an addendum sticker on the vehicle's window detailing the various additional dealer charges, there was no addendum sticker on this vehicle. Because the automobile had no air-conditioner, Proctor asked that one be added. In the office, Starcher put together a worksheet on the vehicle and listed the following items on the worksheet:

"Basic Delivered Price of Unit $11,966.00
"AMV 389.00
"Protection Pkg 495.00
 __________
 $12,850.00
"Air Condition 895.00
 __________
 $13,745.00"

Proctor asked about the charge for "AMV," and she testified that Starcher told her that AMV was a fee similar to taxes, tags, and title. Starcher denied that he gave this explanation. He testified that all he told her was that AMV was "adjusted market value." Defendants acknowledge that AMV is actually an additional dealer profit or markup.
After negotiations, Proctor agreed to buy the vehicle if the charges for the protection package and the air-conditioner were taken off. At that point, she signed the worksheet. She testified that she thought that she had agreed to pay only $12,355.00 for the vehicle. The worksheet reflects that the selling price was to be $13,150.00. See Appendix A. Proctor stated that she did not believe that the figure of $13,150.00 was on the worksheet at the time she signed it, and she also said that she was never given a copy of the worksheet.
Proctor was then taken to the finance office for the preparation of the final contract. She testified that she felt rushed in executing the documents and did not examine them. The "Retail Order and Invoice" indicates a "Basic Delivered Price of Unit" of $13,150.00. Added to that unit price are charges for "Borg-Warner" ($795.00), "Sales Tax" ($160.33), "License or Transfer Fee" ($3.00), and "Invoicing and Services" ($92.00), for a total price of $14,200.33. Proctor was given a "Total Credit" for her trade-in of $2.11; this "Total Credit" was figured by adding the used car allowance of $5,862.11 plus her cash payment of $2,358.41 and then subtracting the amount Proctor still owed on her trade-in. This left an unpaid balance of $14,198.22, which was to be financed for 60 months at $326.69 per month. See Appendix B. Proctor signed the Retail Order and Invoice and the "Alabama Vehicle Retail Installment Contract," which also indicated the amount financed to be $14,198.22. Nowhere on either of these documents was there a listing of the protection package and air-conditioner charges. Proctor took the vehicle and copies of the contracts home on the date of sale.
Southern States submitted Proctor's credit application to Union Bank & Trust *1083 Company, but Union Bank would not extend credit for the full amount and requested that an additional $1,500.00 of the purchase price be paid in cash rather than be financed. Southern States called Proctor and told her that she would have to pay an additional $1,500.00 in cash. She refused, and eventually Southern States agreed to guarantee to the financing institution $1,500.00 of the total amount financed.
Because of this problem with the financing, Southern States asked Proctor to come back to the dealership in order to execute a new set of contracts. Before she returned to the dealership, she had discussed the matter with an attorney friend, who counseled her not to sign any more papers. Nevertheless, on August 20, 1986, Proctor signed a new set of contracts.[1] The new documents were apparently the same as those executed previously except that the name of the financing institution was changed from Union Bank to Ford Motor Credit Company.
The defendants argue that the trial court should have directed a verdict in their favor on the basis that Proctor's reliance on the misrepresentations of the salesman was unreasonable, as a matter of law. The scintilla rule, which was applicable in this case, requires that an issue in a civil case go to the jury if the evidence, or a reasonable inference therefrom, furnishes as much as a glimmer or trace in support of an issue. Alabama Farm Bureau Mut. Cas. Ins. Co. v. Haynes, 497 So.2d 82, 85 (Ala.1986). This Court stated in National Security Fire & Cas. Co. v. Vintson, 454 So.2d 942, 943-44 (Ala.1984):
"A directed verdict is proper only when there is a complete absence of proof on a material issue or where there are no disputed questions of fact on which reasonable people could differ. Ritch v. Waldrop, 428 So.2d 1 (Ala.1982). When a motion for directed verdict is requested, the entire evidence must be viewed in a light most favorable to the opposing party. Ott v. Fox, 362 So.2d 836 (Ala.1978)."
Defendants contend that there is no evidence that the plaintiff reasonably relied upon the alleged misrepresentations. Of course, reasonable reliance is a necessary element of a claim for misrepresentation.
"Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover."
Torres v. State Farm Fire & Cas. Co., 438 So.2d 757, 758-59 (Ala.1983).
Defendants rely heavily on the case of Traylor v. Bell, 518 So.2d 719 (Ala.1987). In Traylor, the plaintiff alleged that an automobile dealer had defrauded him by adding the cost of a protective package to what the plaintiff understood the sale price to be. Plaintiff signed a "retail buyer's order" that contained the higher figure and that did not itemize the charge for the protective package. However, the charge for this protective package was contained in a dealer's "add-on" sticker that was on the car window. In that case, the plaintiff never read the sales documents before he signed them, because he was a poor reader and had poor eyesight. This Court held that there had been no reasonable reliance on the part of the plaintiff.
Defendants in this case strongly urge that if the uneducated plaintiff in Traylor did not reasonably rely upon the alleged misrepresentations there, then the well-educated plaintiff in this case could not be found to have reasonably relied on the misrepresentations alleged to have been made here.
Plaintiff contends otherwise. She argues that the case of Village Toyota Co. v. Stewart, 433 So.2d 1150 (Ala.1983), is more *1084 analogous to the present case than is the Traylor case. In Village Toyota, the facts were as follows:
"The plaintiffs saw the sticker, which included a charge for TLC. They subsequently told the defendant's salesman they did not want this option; however, they did want air conditioning and a radio. The defendant then quoted a total price for the car, which should have reflected only the options the plaintiff[s] wished to purchase. There was no price breakdown given for any of these options. Therefore, under the evidence presented, the jury could have found that the plaintiffs were justified in thinking that defendant had subtracted the price of the TLC and added the price of the air conditioning and radio in arriving at the total price. Thus, the plaintiffs' reliance on the defendant's misrepresentation was reasonable under these circumstances."
433 So.2d at 1154-55.
We are of the opinion that the present case is more like Village Toyota than like Traylor. In Traylor, the cost of the protective package was added into the total price without the plaintiffs ever knowing about that charge at all, even though the cost of the protective package was clearly visible in an "add-on" sticker on the car. The plaintiff apparently never inquired about the protective package, and, had he examined the final price on the sales agreement or the "add-on" sticker, he would have noticed the difference due to that charge. Here, as in Village Toyota, the plaintiff did inquire about the various options and stated that she would pay for some but not for others. Also, the jury could have found that she was not given the worksheet, and neither of the contract documents contained a breakdown of which charges had been added to the price; as in Village Toyota, in this case the jury could have found that the plaintiff was justified in thinking that the defendants had correctly subtracted the price of the protection package and the air-conditioner and added an AMV. Further, there was no "add-on" sticker itemizing the options, as there was supposed to be, and there was evidence that the defendants had lied about the AMV charge.
Here, the plaintiff testified concerning her understanding of the "deal," as follows:
"Q. What was the sticker price?
"A. Eleven, nine sixty-nine.
"Q. If the deal that you thought that you had finally made was, you were going to pay sticker price, plus AMV?
"A. Yes, sir.
"Q. How much is AMV?
"A. Three hundred and eighty-nine dollars.
"Q. So you thought you were paying twelve thousand three hundred and fifty-five dollars for that car?
"A. That's thethat's the only charge that I thought was being added to the vehicle, other than the sticker price, and I only thought that was being added because it was a standard fee.
"Q. But you understood that the deal that you had made with Mr. Starcher, was that you were going to pay for this car, twelve thousand, three hundred fifty-five dollars?
"A. I feltI knew I was going to pay the sticker price, plus the AMV.
"Q. You had looked at the sticker price before you even signed the worksheet?
"A. Uh-huh, I looked at it on the car out in the lot.
"Q. And you looked at it on the worksheet?
"A. Right.
"Q. And you looked at the AMV price on the worksheet; is that correct?
"A. Yes, sir.
"Q. So you expected to pay twelve thousand three hundred fifty-five dollars?
"A. I'm sure at that time I didn't add it up in my head, but I felt like that was the deal we had come to and I was going to pay that for the car.
"* * * *
"Q. Miss Proctor, tell the jury what you thought the deal [was] that you had on August 15th, and then again on August *1085 20th, when you left? Tell me what you thought it was?
"A. The deal that I had, and I had from Mr. Starcher, which I trusted him as a salesman, was that I was not being charged for the Protection Package, or the air conditioner, and I was charged for AMV, which I was told, when I asked him, it was for a charge similar to taxes and title.
"Q. If you had known it was profit, would you have been willing to pay it?
"A. No, its sort of like the protection package. The way I feel about it, mean, it was, there was nono, it was just profit."
The AMV charge was a part of the purchase price plaintiff paid for the automobile, and she testified that had she been told truthfully what AMV was, she would not have paid it. An argument could be made that she should have noticed, in any event, that the $13,150 price on the document exceeded what she thought she would pay, even with the AMV added, and that she could not have reasonably relied upon the salesman's statement. We believe that the jury was authorized to find that the salesman intentionally misled her about the basis for the AMV charge; that she would not have paid the AMV charge had she known the truth; that her reliance upon the statement by the salesman was reasonable; and that she suffered detriment as a result thereof. She testified that she thought the $13,150 price represented the sticker price, plus AMV, plus an extended warranty.
Based upon the above, we conclude that there was evidence that the plaintiff reasonably relied on the alleged misrepresentations and that the trial judge properly denied the defendants' motion for a directed verdict.
Defendants also argue that the evidence was insufficient to warrant the recovery of punitive damages. If the evidence establishes an intent to deceive or defraud, then punitive damages are recoverable. American Honda Motor Co. v. Boyd, 475 So.2d 835, 839 (Ala.1985).
There was evidence presented that Southern States' agents had deliberately misrepresented not only to the plaintiff, but to others, that AMV was something other than profit, so the jury could have found the intent element.
We have carefully examined the defendants' other contentions concerning certain evidentiary rulings and find them to be without merit. Therefore, the judgment of the trial court is affirmed.
AFFIRMED.
ALMON, ADAMS and KENNEDY, JJ., concur.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur specially.
STEAGALL, J., concurs in the result.
*1086 
*1087 
HORNSBY, Chief Justice (concurring specially).
I take this occasion to reevaluate and clarify a part of the law of fraud: the element of reliance, the satisfaction of which is a prerequisite to prevailing in an intentional fraud action. Admittedly, some of this Court's previous cases have made the law in Alabama concerning the element of reliance less than pure, a bit confusing, and slightly apart from the settled jurisprudence of other jurisdictions.
The tort of intentional fraud is unique. It is the lone intentional tort where a defendant is permitted to escape liability based on the plaintiff's "neglect."[1] Outside the *1088 scope of this tort, it is generally well settled that where a defendant intentionally injures a plaintiff, the conduct of the plaintiff in bringing about the harm (i.e., his own acts or omissions) is not pertinent.
In the context of intentional fraud, then, a defense based on the unjustifiable reliancei.e., neglectof the plaintiff is peculiar, if not an anomaly or aberration. This peculiarity is magnified when the question of damages arises. Generally speaking, punitive damages are awardable in all intentional tort cases; intentional fraud cases are no exception. E.g., Carnival Cruise Lines, Inc. v. Goodin, 535 So.2d 98 (Ala.1988). As has been recited on countless occasions, punitive damages carry the purpose of punishing the defendant for his misconduct and deterring others from engaging in similar episodes of misconduct. The law punishes one who intentionally injures another and, in so doing, attempts to dissuade others from intentionally causing similar injuries.
But what about the person who intentionally defrauds another? If "no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool," Chamberlin v. Fuller, 59 Vt. 247, 256, 9 A. 832, 836 (1887), and if the "design of the law is to protect the weak and credulous from the wiles and stratagems of the artful and cunning, as well as those whose vigilance and security enable them to protect themselves," Ingalls v. Miller, 121 Ind. 188, 191, 22 N.E. 995, 997 (1889), then why does the law not permit the punishment of intentionally fraudulent scoundrels in every case and encourage the flight of their kind from this State?
As one commentator has written, despite his hyperbole, accurately, "the rule is that one cannot be heard to say he relied upon a statement so patently ridiculous as to be unbelievable on its face, unless he happens to be that special object of the affections of a court of Equity, an idiot." Obiter Dicta, 25 Ford.L.Rev. 395, 397 (1956). To this end, this Court has stated:
"Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover. Bedwell Lumber Co. v. T & T Corporation, 386 So.2d 413, 415 (Ala.1980).
"`If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volunti non fit injuria.'"
"Munroe v. Pritchett, 16 Ala. 785, 789 (1849)."
Torres v. State Farm Fire & Cas. Co., 438 So.2d 757, 758-59 (Ala.1983). By permitting the downtrodden to sue in tort for intentional fraud after "relying" on patently ridiculous representations advances two undesirable ends. First, large verdicts including punitive damages are simply unwarranted where one has "relied" on a promise that he will be furnished the moon. Second, plaintiffs would be encouraged to ignore the absurdity of "relying" on a promise to bring them the moon, knowing full well that, once the moon did not arrive, a large verdict awaited; Alabama courts should not serve as the means for advancing such "counter-schemes."
Somewhere between the deplorable "con job" and the promise to act in a manner beyond the realm of reality, a line for "reliance" must be drawn. At present, the line seems to be drawn at the "reasonableness" mark. See, e.g., Padgett v. Hughes, 535 So.2d 140 (Ala.1988); Cahaba Valley Dev. Corp. v. Nuding, 512 So.2d 46 (Ala. *1089 1987); Hughes v. Cloud, 504 So.2d 734 (Ala.1987); and Bedwell Lumber Co. v. T & T Corp., 386 So.2d 413 (Ala.1980). For the proposition that the plaintiff's reliance must have been "reasonable," Bedwell Lumber relied on Mid-State Homes, Inc. v. Holt, 52 Ala.App. 415, 293 So.2d 476 (1974), which, in turn, relied on Nelson v. Shelby Mfg. & Improv. Co., 96 Ala. 515, 11 So. 695 (1892). Curiously, the Nelson case made no such holding; rather, it merely questioned, in dicta, whether the plaintiff "had a right to rely [on the representation]." Nelson, 96 Ala. at 533, 11 So. at 702. Bedwell Lumber, then, provides the current undergirding of the "reasonable reliance" standard. Similarly, the above-quoted passage from Torres v. State Farm Fire & Cas. Co. traces its roots to Bedwell Lumber. It is Bedwell Lumber, then, that has earned an overdue explanation.
In Bedwell Lumber, T & T Corporation, a land developer, offered to purchase certain undeveloped land from Bedwell Lumber Company. Mr. Bedwell misrepresented that the "platted lots [made the basis of the purchase agreement] had been approved for septic tanks," Bedwell Lumber, supra, 386 So.2d at 414. In upholding a jury verdict for T & T, this Court refused to hold "that T & T Corporation, despite Mr. Bedwell's representation, was obligated, as a matter of law, to instigate an independent investigation which, if pursued, would have disclosed a public record ... [revealing] that 5 of the purchased lots had been disapproved for septic tanks." Id. at 415. Nevertheless, the Court did recognize that "the representee's reliance must be reasonable under the circumstances; and, where a party has reason to doubt the truth of the representation or is informed of the truth before he acts, he has no right to act [or rely] thereon." Id. (emphasis added). It is this last quotation that spawned the current "reasonable reliance" standard; it is also this quotation that relied for its precedent on cases that did not truly or adequately support it.
If we accept the proposition that Bedwell Lumber, although correctly decided, incorrectly introduced the "reasonable reliance" standard, the question remains: What is the proper measure of reliance to support an action based on intentional fraud? According to current tort theory, the inquiry focuses not on whether the plaintiff's reliance was reasonable, nor on whether his conduct is free from neglect; rather, the focus is on whether the reliance is justifiable.[2]
The consideration of whether a given plaintiff's reliance is "justifiable" is not the same as the determination of whether it is "reasonable." The former is more subjective, see 2 Harper, James & Gray, The Law of Torts § 7.12, pp. 462-63 (2d ed. 1986), the latter more objective. "Justifiability" places less emphasis on the "neglect" of the plaintiff, and more on the intentional misconduct of the tort-feasor.
In the case of intentional fraud, it was settled in Alabama, prior to 1980 and the advent of Bedwell Lumber, and in the vast majority of other jurisdictions, that "one may, without investigation, accept and rely upon a positive statement of fact made to him by one with whom he is dealing, particularly where the person making the statement has special knowledge with reference to the subject-matter." 2 Cooley on Torts § 355, pp. 583-84 (4th ed. 1932). Cooley, in fact, quoted at length and with approval a sample of Alabama jurisprudence relating to the element of reliance in intentional fraud cases:
"`Contributory negligence is not a defense to an action for deceit. If the false statement is made by one who may be fairly assumed to know what he is talking about, it may be accepted as true, without question and without inquiry, although the means of correct information are easily within reach.... It would, *1090 indeed, be singular to hold a swindling deceiver exempt from liability because he has swindled only foolishly credulous and trusting persons, and more singular still to hold that such a swindler may successfully plead the incredibility of his falsehood and the folly of his victim's belief.'
"Id. at 585 (quoting King v. Livingston Mfg. Co., 180 Ala. 118, 127-28, 60 So. 143, 145-46 (1912)). See also Franklin v. Nunnelley, 242 Ala. 87, 5 So.2d 99 (1941); Barley v. Wright, 233 Ala. 283, 171 So. 247 (1936); and Wilks v. Wilks, 176 Ala. 151, 57 So. 776 (1912).
The state of the law has so remained to this day, except, apparently, in Alabama. The rule announced by Cooley is, however, subject to the "red flag"[3] exception. A plaintiff has not justifiably relied on a misrepresentation if the statement was one "which any normal person would recognize at once as preposterous," Prosser & Keeton on Torts § 108, p. 750 (5th ed. 1984), or "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth." Id.; cf. 2 Harper, James & Gray, supra, § 7.12, p. 461 ("patently preposterous"); id. at 465 ("patently false or silly").
Lowering the watermark that drowns recovery from reasonable reliance to justifiable reliance also reflects "[t]he recognition of a new standard of business ethics [that] demand[s] [that] statements of fact be at least honestly and carefully made." Prosser & Keeton, supra, § 108, p. 750. This is particularly true in the field of consumer transactions, where Congress in recent years has seen fit to enact a rash of consumer protection laws.[4] On the state level, the Alabama legislature has demanded ethical and honest conduct of realtors, Code 1975, § 34-27-36(a); accountants, Code 1975, § 34-1-12; architects, Code 1975, § 34-2-34; attorneys, e.g., Code 1975, § 34-3-87; auctioneers, Code 1975, § 34-4-29; dentists, Code 1975, § 34-9-18; engineers, Code 1975, § 34-11-11; and the members of virtually every other professional occupation, as well.
Likewise, the courts of this State have sought to ensure that the disparity in bargaining power between buyer and seller in a consumer transaction is not abused by the party with superior knowledge or expertise regarding the subject of the bargain. See, e.g., Ex parte Smith, 412 So.2d 1222, 1225 (Ala.1982) (policy behind permitting punitive damages "is the protection of the public from oppressive practices, particularly in the sale of consumer goods"); see also East River S.S. Corp. Transamerica Delaval, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); Lloyd v. Service Corp. of Alabama, Inc., 453 So.2d 735 (Ala.1984) (recognizing public policy of protecting consumers victimized by disparate bargaining power). Additionally, in Alabama we recognize that, in every transaction, the parties impliedly warrant that they are acting in good faith and are engaging in fair dealing. Barnes v. Atlantic & Pac. Life Ins. Co., 295 Ala. 149, 325 So.2d 143 (1975).
Bedwell Lumber, with its "reasonable reliance" standard, was not incorrectly decided. That case, however, dealt with a dispute among the parties to a commercial transaction, thus parties with presumably equal bargaining power (or, at least, less disparate bargaining power than is presumed in a consumer transaction); in that case, the objective standard of "reasonable reliance" was correctly employed. That standard, however, should not have subsequently trod into the arena of consumer transactions.
One other short line of cases has also clouded the proper standard of adjudging reliance in consumer transactions. In Traylor v. Bell, 518 So.2d 719 (Ala.1987), this Court quoted the following passage *1091 from Gonzales v. U-J Chevrolet Co., 451 So.2d 244, 247 (Ala.1984):
"`Fraud is deemed to have been discovered when the person either actually discovered, or when the person ought to or should have discovered, facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered. Papastefan v. B & L Construction Co., 385 So.2d 966 (Ala.1980); Johnson v. Shenandoah Life Ins. Co., 291 Ala. 389, 281 So.2d 636 (1973).'"
Traylor, 518 So.2d at 720; see also Tribble v. Provident Life & Acc. Ins. Co., 534 So.2d 1096 (Ala.1988); Jarrard v. Nationwide Mut. Ins. Co., 495 So.2d 584 (Ala. 1986). This "gloss" does not accurately support the "reasonable reliance" standard. All three cases relied upon by the Court in TraylorGonzales v. U-J Chevrolet Co., Papastefan v. B & L Construction Co. and Johnson v. Shenandoah Life Ins. Co. involve statute of limitations issues. The focus in those cases was on the plaintiff's prudence in discovering his damage, not on whether his reliance on any representations was warranted.
The cases cited in Traylor correctly reflect that statutes of limitations, even when based on the "discovery rule" in the fraud context, should be measured by objective standards. Traylor itself, however, is an intentional fraud case involving a consumer transaction and no statute of limitations issue; the focus there was on the plaintiff's reliance, and thus on a question wholly different from when the plaintiff should have discovered the fraud. Obviously, the plaintiff in Traylor discovered that he had been damaged as the result of the defendant's misrepresentation, i.e., the plaintiff discovered the fraud; the sole question left undetermined was whether his reliance was warranted. That determination, as we recognize today, should have been made according to subjective standards by asking whether the reliance was justifiable, not according to objective standards measuring the reasonableness of the plaintiff's reliance, and certainly not by resort to an inappropriate analogy to a statute of limitations concern.
Munroe v. Pritchett, 16 Ala. 785 (1849), is vital and is consistent with my analysis. In that case, the Court wrote:
"If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, `volunti non fit injuria.'"
Id. at 789. That Court also recognized strong public policy that dictates punishing those who profit by their resort to trickery and deceit:
"`He who affirms either what he does not know to be true, or knows to be false, to another's prejudice and his own gain, is, both in morality and law, guilty of falsehood, and must answer in damages.' The concluding remark in the foregoing extract ... we think is a very just and correct exposition of the rule of law."
Id. (quoting Adamson v. Jarvis, 4 Bing. 66, 73, 130 Eng.Rep. 693, 696 (C.P.1827)) (emphasis in Munroe).
In an intentional fraud case involving a consumer transaction there are two competing concerns: ensuring that the consumer take some measure of self-protection, and dissuading sellers from engaging in deceitful conduct and punishing them if they do. Taken literally, the emphasized quotation above from Munroe v. Pritchett, supra, could be interpreted to impose strict liability for intentional fraud. This result ignores the first concern: requiring the consumer to protect his own interests, at least minimally. On the other hand, a "reasonable reliance" standard that compares a given plaintiff's conduct to what the elusive "reasonable man" would have done under identical circumstances too often precludes punishing those who gain by their lies and deterring others who might be tempted to act similarly. The resolution, then, should be a compromise between these points.
"Reliance" should be assessed by the following standard: A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully understand *1092 the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth." Prosser & Keeton, supra, § 108, at 750. This rule recognizes the vitality of the bar to recovery forged in Munroe v. Pritchettwhere "the purchaser blindly trusts"and balances it with the policy of punishing liars and deterring deceitful practices.
The people of Alabama should be able to presume that their neighbors are honest people; suspecting deceit is a duty that should not be borne, and a characteristic that should not be coveted. "The law protects even careless dupes from fraud. And this is true even though the investigation `could be made without any considerable trouble or expense.'" Harper, James & Gray, supra, § 7.12, at 456-58 (quoting Restatement (Second) of Torts § 540 comment a (1977)). Unless one's reliance is unjustifiable, based on a representation patently ridiculous on its face, the intentional fraud action should succeed, the defrauder should be punished, and other potential deceivers should be shown the light of the law.
In my opinion, the representation made to Proctor in this case was not patently ridiculous on its face. Moreover, the record discloses ample evidence from which a jury could conclude that the representation was made with the intent to deceive Proctor. Therefore, I agree that the judgment in favor of the plaintiff is to be affirmed.
JONES and SHORES, JJ., concur.
HOUSTON, Justice (concurring with the majority opinion, but writing specially to address Chief Justice Hornsby's special concurrence).
Reasonable reliance or justifiable reliance? I see no difference in the two phrases. Black's Law Dictionary (5th ed. 1979) at 1138 defines "reasonable" as "[f]air, proper, just, moderate, suitable under the circumstances" (emphasis supplied) and at 778 defines "justifiable" as "[r]ightful; defensible; warranted or sanctioned by law; that which can be shown to be sustained by law."
In Chief Justice Hornsby's special concurrence, he states that "justifiable" is more subjective and "reasonable" is more objective, and that justifiability places less emphasis on neglect of the plaintiff and more on the intentional misconduct of the tort-feasor.
Perhaps I feel more comfortable with the felicitous phrase "reasonable reliance" than the suggested phrase, which is equally felicitous, "justifiable reliance," only because the change of designation will be used to change the law as set out in the following portion of Torres v. State Farm Fire & Casualty Co., 438 So.2d 757, 758-59 (Ala.1983):
"Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests. In order to recover for misrepresentation, the plaintiffs' reliance must, therefore, have been reasonable under the circumstances....
"`If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volunti non fit injuria."
"Munroe v. Pritchett, 16 Ala. 785, 789 (1849)."
To be actionable, as "misrepresentation," there must be a misrepresentation of a material fact that is acted upon by the opposite party (Ala.Code 1975, § 6-5-101), and an action based on "deceit" requires a willful misrepresentation of a material fact that is made to induce another to act, and the opposite party must in fact act upon it to his injury (§ 6-5-103).
The concept described in legislative parlance as "acted upon" has in judicial parlance become "reliance."
*1093 Should the policy of the courts not be to continue to discourage misrepresentation and deceit and to continue to discourage negligence and inattention to one's own interest?
Would not the ground or reason of the quoted portion of Torres, the ratio decidendi of that decisionand of Dickinson v. Moore, 468 So.2d 136 (Ala.1985); Rich Crest Homes, Inc. v. Vaughn Place, Inc., 485 So.2d 1123 (Ala.1986); Wilson v. Brown, 496 So.2d 756 (Ala.1986); First National Bank of Mobile v. Horner, 494 So. 2d 419 (Ala.1986); Newman v. First National Bank of Mobile, 497 So.2d 106 (Ala. 1986); Hughes v. Cloud, 504 So.2d 734 (Ala.1987); Webb v. Reese, 505 So.2d 321 (Ala.1987); Turner v. Landmark Chevrolet, Inc., 514 So.2d 1337 (Ala.1987); Hinson v. Center Court Productions, 514 So.2d 1374 (Ala.1987); Southern Life & Health Ins. Co. v. Smith, 518 So.2d 77 (Ala.1987); MacKinnon v. St. Louis Southwestern Ry., 518 So.2d 89 (Ala.1987); Syx v. Midfield Volkswagen, Inc., 518 So. 2d 94 (Ala.1987); Traylor v. Bell, 518 So.2d 719 (Ala.1987); Boswell v. Coker, 519 So.2d 493 (Ala.1987); Pranzo v. ITEC, Inc., 521 So.2d 983 (Ala.1988); Cherokee Farms, Inc. v. Fireman's Fund Ins. Co., 526 So.2d 871 (Ala.1988), which all follow Torres on this point"hypothetically be consented to today by the conscience and the feeling of justice of the majority of all those whose obedience is required by [that] rule of law?" Laun, Stare Decisis, 25 Va.L.Rev. 12, 22 (1938). I believe that it would; therefore, I would follow the doctrine of stare decisis on the concept of reliance (that which is acted upon), rather than promulgate a new test for misrepresentation or deceit that would remove the element of reliance from these causes of action unless the representation was "patently ridiculous on its face." For a plaintiff to recover for misrepresentation or deceit, I believe that he must rely on the representation and that such reliance must be reasonable (justified) under the circumstances. It may be that a plaintiff has not the intellect or education to discern what would be "patently ridiculous on its face" to a reasonable man. Should not such a person have protection in the way of a cause of action for damages if he relies on those assuring him of the medicinal properties of snake oil or clear title to the Brooklyn Bridge? On the other hand, plaintiffs could be intelligent, well-educated individuals and it still be said of them:
"They have mouths, and speak not: eyes have they, and see not.
"They have ears, and hear not: noses have they, and smell not."
The Book of Common Prayer 115:5 (1662).
I see no compelling reason to depart from stare decisis and to encourage ostrichism in a free, democratic, upwardly mobile society. I am not attached to the phrase "reasonable reliance." It could be that it has become a lazy judge's[1] catch word, such as Justice Oliver Wendell Holmes warned against in his Collected Legal Papers (1921) at 230-31:
"It is not the first use, but rather the tiresome repetition of inadequate catch words, ... phrases which originally were contributions, but which, by their very felicity, delay further analysis for fifty years."[2]
I am content to substitute "justifiable reliance" for "reasonable reliance," but I would do so only with the clear understanding that the Torres concept of reliance was not thereby overruled.
NOTES
[1] The first set of contracts was not retained by either Proctor or Southern States.
[1] The term "neglect" is concededly used inartfully but serves well from the standpoint of convenience. Prosser and Keeton instruct: "Rather than contributory negligence, the matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case, and so comes closer to the rules which are associated with assumption of risk." Prosser & Keeton on Torts § 108, p. 751 (5th ed. 1984); see also 2 Harper, James Gray, The Law of Torts § 7.12, p. 461-62 (2d ed. 1986).
[2] Holman v. Joe Steele Realty, Inc., 485 So.2d 1142 (Ala.1986), exemplifies the confusion surrounding the element of reliance. Compare id. at 1144 ("There is no showing in the record of the plaintiff's justifiable reliance upon the alleged fraudulent representations of Clokey") (emphasis added) with id. at 1145 ("The actual or imputed knowledge of the Holmans ... precludes any finding of a reasonable reliance upon the alleged representation of Clokey") (emphasis added).
[3] "Red flag," in the intentional fraud scenario, is a phrase most recently appearing in Padgett v. Hughes, 535 So.2d 140 (Ala.1988).
[4] Among the more prominent of such laws are the Securities Act of 1933 (currently 15 U.S.C. §§ 77a-77aa); the Securities Exchange Act of 1934 (currently 15 U.S.C. §§ 78a-78kk); the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301-2312); the Truth-in-Lending Act (15 U.S.C. §§ 1601-1677); and the Interstate Land Sales Full Disclosure Act (15 U.S.C. §§ 1701-1720).
[1] I have authored opinions using the phrase "reasonable reliance": Wilson v. Brown, supra; First National Bank v. Horner, supra; Southern Life Insurance Co. v. Smith, supra; Syx v. Midfield Volkswagen, Inc., supra.
[2] This quote from Justice Holmes was first brought to my attention by an article written by Dr. Jim Vickery, "The Power of Felicitous PhrasingA Note on the Origin and Nature of the Right to Punitive Damages in Alabama Law," which is awaiting publication.