659 F.2d 789
 In re OIL SPILL BY the "AMOCO CADIZ" OFF the COAST OF FRANCE
MARCH 16, 1978.
AMOCO TRANSPORT COMPANY and Amoco International Oil Company,
Plaintiffs- Appellees,
v.
BUGSIER REEDEREI AND BERGUNGS, A. G., Defendant-Appellant.
 No. 80-2402.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 25, 1981.
Decided Sept. 15, 1981.
 
 Nicholas J. Healy, Healy & Baillie, New York City, for plaintiffs-appellees.
 Frank Cicero, Jr., Kirkland & Ellis, Chicago, Ill., for defendant-appellant.
 Before SWYGERT*, Senior Circuit Judge, BAUER, Circuit Judge, and CRABB**, District Judge.
 CRABB, District Judge.
 This is an interlocutory appeal taken from one of the many cases spawned by the March 16, 1978 oil spill off the coast of France.[1] The issue on appeal is whether the district court erred in denying the motion of defendant-appellant for a stay of proceedings pending arbitration of certain disputes between the parties. We conclude that the arbitration should proceed and, accordingly, we reverse.
 Factual Background
 A brief review of the events leading up to the disaster is necessary to an understanding of the claims at issue.
 At about 0945 hours Greenwich Mean Time (GMT), on March 16, 1978, approximately eight miles north of Ushant Island off the French coast, the Amoco Cadiz, a crude carrier owned by plaintiff-appellee Amoco Transport, suffered a complete failure of her steering gear and began to drift, out of control, in heavy seas and strong winds. Her radio messages warning all ships to stand clear were intercepted by the Pacific, one of a number of ocean-going salvage tugs owned by defendant-appellant. The Pacific changed course immediately to come to the aid of the Cadiz and her 230,000 tons of Iranian oil. At 1128 GMT the Pacific advised the Cadiz of her change of course and offer of assistance, proposing that any assistance rendered be in accordance with Lloyd's Standard Form of Salvage Agreement (LSA). At about the same time the master of the Pacific called Bugsier's Hamburg office which in turn called its London agent, Hutton, with instructions to negotiate an LSA with the owners of the Cadiz. Hutton sent a telex to Amoco Transport's agent in Chicago, Amoco International, offering Bugsier's assistance and proposing performance under the LSA.
 While Hutton was conducting trans-Atlantic negotiations with Amoco Transport in Chicago, the Pacific arrived alongside the Cadiz, again offering her services pursuant to the LSA. Although the master of the Cadiz declined to accept the LSA, the Pacific proceeded to prepare a tow line and attached its tow line to the tanker. It was not until about 1600 GMT that the Cadiz advised the Pacific that it would enter into the LSA. By this time, towing attempts had been under way for almost four hours, but the tanker's drift could not be stopped. At 1618 GMT the Pacific's tow line broke. At about 2055 GMT the Pacific was able to secure another line. At 2104 GMT the tanker ran aground while under tow. Finally, at 2212 GMT, the tow connection broke, the Cadiz floated free briefly, grounded again and broke apart.[2]
 On January 16, 1979, Amoco Transport Company and Amoco International Oil Company began this action against Bugsier in the Eastern District of Virginia, obtaining personal jurisdiction by maritime attachment of Bugsier's tug Atlantic. Plaintiffs charged Bugsier with negligence, breach of an alleged warranty of seaworthiness, and false and fraudulent misrepresentations, acts, or omissions in connection with the attempted salvage of the Cadiz. Bugsier moved for dismissal on the ground of forum non conveniens or for a stay pending arbitration and, at about the same time, began arbitration proceedings in London in accordance with the LSA.[3] Those proceedings remain pending, but have been held in abeyance until final disposition of Bugsier's motion for a stay.
 The Lloyd's Standard Form of Salvage Agreement
 The LSA entered into by the parties is a standard form of salvage agreement commonly referred to as a "no cure, no pay" contract. Paragraph 1 of the agreement provides:
 The Contractor agrees to use his best endeavours to salve the __________ and/or her cargo and take them into __________ or other place to be hereafter agreed. The services shall be rendered and accepted as salvage services upon the principle of "no cure no pay." In case of arbitration being claimed the Contractor's remuneration in the event of success shall be fixed by arbitration in London in the manner hereafter prescribed: and any difference arising out of this Agreement or the operations thereunder shall be referred to arbitration in the same way. In the event of the services referred to in this Agreement or any part of such services having been already rendered at the date of this Agreement by the Contractor to the said vessel and/or her cargo it is agreed that the provisions of this Agreement shall apply to such services.
 The agreement also contains provisions for security (in lieu of a maritime lien) for services rendered, for arbitration and for appeal from arbitration. Of the eighteen separate provisions of the agreement, eleven relate to arbitration or to appeal from arbitration. Paragraph 8 of the LSA lists the parties who may file claims for arbitration: (1) the owners of the ship; (2) the owners of the cargo or any part thereof; (3) the owners of any freight separately at risk or any part thereof; (4) the contractor; (5) any other person who is a party to the agreement. Corresponding to the provisions for arbitration is a stipulation of the applicability of English salvage law.
 Proceedings in the Lower Court
 In their complaint against Bugsier, plaintiffs-appellees alleged that in undertaking to assist the Cadiz, Bugsier owed a duty to plaintiffs-appellees to act with due diligence and to exercise reasonable skill, care and prudent seamanship, and that Bugsier failed to so act, but instead acted negligently and improperly;[4] that Bugsier's actions constituted willful and wanton misconduct and gross negligence; that Bugsier warranted the seaworthiness and towing capabilities of its tug and breached those warranties; that Bugsier made material misrepresentations concerning the ability of its tug to assist the Cadiz ; and that Bugsier failed to exercise reasonable care to determine the truth or falsity of its representations.
 The lower court held that most of these alleged breaches of duty occurred prior to any attempts to salve the Cadiz ; that, although the damage occurred in the grounding and loss of cargo, the duty was breached in the undertaking itself and at the moment of the alleged misrepresentation; and that, even if other claims arose while the LSA was in effect, the earlier claims are the crux of plaintiffs-appellees claims and predominate over the others. The court concluded that the inseparability of the later claims "from those which matured previously" precluded reference of the later claims to arbitration.
 In their motion seeking certification of this matter for interlocutory appeal, Bugsier asked for certification of three questions of law: (1) whether, in deciding a motion for stay pending arbitration, the court must accept as true the allegations in the complaint; (2) whether a salvor has any legal duty to the owner of a disabled tanker before the salvor acts to salvage the tanker and before a salvage agreement is made, and (3) whether a tort can mature before the alleged victim sustains any damage.
 It is not clear from the certification order that the trial court viewed the particular questions posed by Bugsier as appropriate for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). It is clear that the court saw, as we do, that the overriding issue is that of the arbitrability of the claims raised against Bugsier.[5] It is that issue to which this opinion is addressed.
 For their part, plaintiffs-appellees urge affirmance of the district court's denial of a stay on the grounds stated by the court or on two alternative grounds: first, that the LSA applies only to claims involving the salvor's remuneration for successful salvage operations and not to tort claims, and that because this agreement does not cover tort claims, they never agreed to arbitration of such claims; second, their complaint includes claims, not yet resolved, of fraudulent inducement to enter into an arbitration agreement. Additionally, they contend that plaintiff-appellee Amoco International was not a party to the salvage agreement and therefore, cannot be bound by its terms.
 OPINION
 In resolving a question of arbitrability, the starting point must be the United States Arbitration Act, 9 U.S.C. § 1 et seq. This act provides that an arbitration provision in any maritime transaction or in a contract evidencing a transaction involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract ..." (9 U.S.C. § 2); it requires the federal court to stay the trial of any action arising out of issues "referable to arbitration under an agreement in writing for such arbitration...." once the court has determined the basic question of whether the claims raised are subject to arbitration (9 U.S.C. § 3); and it provides that
 If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same shall be in issue, the court shall proceed summarily to the trial thereof. (9 U.S.C. § 4)
 The question of arbitrability has two parts: (1) whether the allegedly wrongful conduct is of a nature covered by the agreement and (2) whether the conduct occurred during the time period covered by the agreement.
 Substantive Scope of the LSA
 The district court seems to have reached the implicit conclusion that the LSA arbitration provisions extend to tort claims against the salvor, questioning only the temporal limits of the agreement.[6] Its conclusion as to the substantive scope of the agreement is supported by the language of the contract and by English case law.
 The first clause of the LSA provides for the arbitration not only of claims for remuneration arising out of successful operations, but of "any difference arising out of this Agreement or the operations thereunder...." (Emphasis added).
 Significantly, in the leading cases of Tojo Maru (1972) A.C. 242 and The Eschersheim (1974) 2 Lloyd's Rep. 188 (Q.B.), aff'd (1976) Lloyd's Rep. 81 (C.A.) aff'd, 1976, 2 Lloyd's Rep. 1 (H.L.), English courts have read the LSA to cover claims for negligence in the salvage operation. In Tojo Maru, a claim for salvage and a counterclaim for negligently-caused damage in an amount exceeding the salvage claim went to arbitration under the LSA. Subsequently, the court upheld the arbitrator's positive award in favor of the shipowner.
 In The Eschersheim, a negligence action by a shipowner arising out of the grounding of the ship on the coast of Spain and resulting loss of a cargo of insecticide, the court required the owner to proceed to arbitration, holding that "On the true construction of the Lloyd's Salvage agreement not only claims by the salvors for salvage remuneration but also claims by owners of salved property for negligence in salvage operations were to be referred to arbitration."[7]
 Plaintiffs-appellees resist this interpretation of the LSA. They contend that, as a general rule, tort claims are not arbitrable under a contract arbitration clause unless there is a specific provision to that effect. For this contention, they cite Old Dutch Farms, Inc. v. Milk Drivers & Dairy Emp. Union, 359 F.2d 598 (2d Cir. 1966), a case arising out of an employer-union dispute; specifically, efforts by a union to induce work stoppages by employees of a neutral supplier of Old Dutch in an effort to persuade the supplier to cease doing business with Old Dutch. The employer sued the union under 29 U.S.C. § 187 (§ 303 of the Labor Management Relations Act) for damages for business injuries incurred as a result of unlawful union activity; the union sought a stay pending arbitration. Finding that resolution of the employer's claim raised no issue requiring construction of the collective bargaining agreement and that there was nothing in the agreement to suggest that the parties had contemplated arbitration of allegedly unlawful labor practices, the court of appeals held that the employer could not be required to submit its damage claim to arbitration.
 Old Dutch does not compel the conclusion that any claim founded in tort is beyond the scope of an arbitration agreement. Whether a particular claim is arbitrable depends not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause. Were the rule otherwise, a party could frustrate any agreement to arbitrate simply by the manner in which it framed its claims. See, e. g., Altshul Stern & Co. v. Mitsui Bussan Kaisha, Ltd., 385 F.2d 158 (2d Cir. 1967), in which the court held that tort claims arising out of or related to a breach of contract were arbitrable under an arbitration provision covering "any dispute or difference arising out of or relating to this contract," observing that the plaintiff could not "avoid the language of the arbitration clause by casting its complaint in tort." Id. at 159.
 Unlike the unfair labor practice claims in Old Dutch, the claims of misrepresentation and breach of duty are germane to the subject matter of the arbitration clause. The claims clearly concern "difference(s) arising out of this Agreement or the operations thereunder" and they can be determined only by evaluating the manner in which Bugsier's tug performed the salvage operation, taking into consideration such matters as the prevailing weather conditions, the situation of the Cadiz, the availability of other salvage vessels, the resources of the Pacific and the skill of her crew.[8]
 Plaintiffs-appellees' assertion of fraudulent inducement requires only brief comment because the matter was not pursued in the district court despite the specific provisions for summary disposition of such a claim contained in 9 U.S.C. § 4. Apparently, the district judge saw no merit in such a claim; he was careful to note that the claims raised by plaintiffs-appellees were not based upon fraudulent inducement. Because a claim of fraud in the inducement of a contract is a matter for arbitration, Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), plaintiffs-appellees' assertion has cogency only if we accept their contention that the LSA is exclusively an agreement to arbitrate. According to Prima, it is only claims of fraud in the inducement of an agreement to arbitrate which raise an issue for the court to resolve. Id. at 403-404, 87 S.Ct. at 1805-1806.
 We do not accept plaintiffs-appellees' characterization of the LSA. As important as the LSA's arbitration provisions are, they are not the exclusive subject matter of the agreement. Its scope extends to the entirety of the relationship between salvor and distressed vessel: the authority of the master to enter into an agreement, the nature of the salvage undertaking, the use of the distressed vessel's equipment, the docking of the salved vessel, the arrangements for security after a successful operation, and the method by which the salvage award is to be determined.
 Temporal Scope of the LSA
 The district court found that the claims against Bugsier were outside the scope of the LSA because they "matured" before the Pacific undertook any salvage activity.[9] The court seems to have assumed that the claims were ones on which plaintiffs-appellees could have sued Bugsier in the absence of an agreement. While this may be so, it is not determinative of the issue central to this dispute: the scope of the arbitration clause. The question is whether the arbitration clause of the LSA covers the particular claims made by plaintiffs-appellees regardless of when the torts may have been committed or when Bugsier's duty to plaintiffs-appellees arose.[10]
 It is our view that the agreement is intended to and does cover the alleged breaches of duty and misrepresentation, given the close relationship of those torts to the subject matter of the LSA and given, also, the ease with which such claims can be invoked against a salvor in circumstances such as those present in this case. We conclude that the tort claims raised by plaintiffs-appellees must be submitted to arbitration as coming under Clause 1 of the LSA, whether the torts are alleged to have been committed before or after the commencement of any salvage activity or before or after the execution of the LSA.
 Our finding in favor of arbitration is bolstered by the strong public policy favoring arbitration of maritime and commercial disputes which is embodied in the Arbitration Act and the special deference owed to forum-selection clauses in international contracts. See, e. g., Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).
 Arbitration of the Amoco International Claims
 Although plaintiff-appellee Amoco International (International) was joined as plaintiff with Amoco Transport (Transport) in the bringing of this complaint, it contends now that its claims against Bugsier are independent of those raised by Transport and that these independent claims give it a separate basis on which to assert a right to a judicial forum stemming from the fact that International never entered into any agreement with Bugsier and has never consented to have its disputes resolved by arbitration.
 This argument has little force. By its own allegations, International's stake in this controversy is as Transport's agent.[11] Having alleged an agency relationship as a basis for its standing in the suit, it cannot slough off that relationship at will. It would advance neither judicial economy nor the purposes of the federal arbitration act to permit International to assert in a judicial forum claims grounded upon its alleged relationship to Transport and to allow it to disavow the relationship for purposes of arbitration, or to allow Transport to defeat the effect of an arbitration agreement by joining a nonsignatory as a party-plaintiff in its complaint. Cf. Tepper Realty Co. v. Mosaic Tile Co., 259 F.Supp. 688 (S.D.N.Y.1966). We conclude that both plaintiffs-appellees are bound by the arbitration agreement entered into by Transport and that their claims against Bugsier should proceed to arbitration. Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.
 REVERSED AND REMANDED.
 
 
 
 *
 At the time of oral argument, Judge Swygert was a circuit judge in active service; he assumed senior status on July 1, 1981
 
 
 **
 The Honorable Barbara B. Crabb, Judge of the United States District Court for the Western District of Wisconsin is sitting by designation
 
 
 [1]
 All of the cases have been consolidated in the Northern District of Illinois for pretrial proceedings upon transfer by the Judicial Panel on Multi-District Litigation
 
 
 [2]
 There is no dispute among the parties as to these facts. For this reason, we see no need to discuss in any detail Bugsier's claim that the district court erred in stating that it was accepting as true all of the allegations of plaintiffs-appellees' complaint for the purpose of deciding Bugsier's motion for stay pending arbitration. The determination of arbitrability in this case turns upon the question of whether the plaintiffs-appellees' legal claims are within the scope of the salvage agreement, not upon the resolution of any disputed issue of fact
 
 
 [3]
 The timeliness of the demand for arbitration is not in dispute
 
 
 [4]
 Plaintiffs-appellees contend that Bugsier was negligent in the following respects:
 (a) Defendant Bugsier failed to ascertain all the conditions and circumstances affecting the tug Pacific's proposed attempt to tow the Amoco Cadiz.
 (b) Defendant Bugsier failed to prepare an adequate and proper towage plan.
 (c) Defendant Bugsier knew or should have known that the Pacific and its equipment were unseaworthy and unsuitable for towing the Amoco Cadiz.
 (d) Defendant Bugsier knew or should have known that the master, officers and crew of the tug Pacific were incompetent and incapable of performing the proposed towage of the Amoco Cadiz.
 (e) Upon realizing its inability to tow the Amoco Cadiz, defendant Bugsier failed to notify the master of the Amoco Cadiz of said inability to tow and failed to seek prompt additional assistance.
 (f) Defendant Bugsier failed to maintain an adequate radio watch and failed to respond to requests for information from the master of the Amoco Cadiz.
 (g) Defendant Bugsier knew or should have known that the towing chain used on the first attempted tow was defective.
 (h) On the second attempt at towing, defendant Bugsier failed to tow the Amoco Cadiz in the proper direction, and instead pulled the ship onto the rocks where it grounded.
 
 
 [5]
 It is not essential that we identify with certainty the precise questions certified by the district court since the nature and scope of our review are not determined by that certification. Rather, we are free to consider " 'such questions as are basic to and underlie the order supporting the appeal.' 9 Moore's Federal Practice P 110.25(1), p. 270." Helene Curtis Ind. v. Church & Dwight Co., 560 F.2d 1325, 1335 (7th Cir. 1977) cert. denied, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772. See also, Nuclear Engineering Co. v. Scott, 660 F.2d 241 at 246 (7th Cir. Aug. 26, 1981)
 
 
 [6]
 The district court found that Bugsier's duties to plaintiffs-appellees arose and were breached prior to any activity undertaken under the contract; however, it noted that "It is possible that certain tort claims may have arisen while the contract was in effect, but these claims are inseparable from those which matured previously."
 
 
 [7]
 See also, D. R. Thomas, Lloyd's Standard Form of Salvage Agreement A Descriptive and Analytical Scrutiny, 2 L.M.C.L.Q. 276, 277-278 (1978)
 
 
 [8]
 A discussion of the duty and standard of care owed by a salvor may be found in D. R. Thomas, Salvorial Negligence and Its Consequences, 2 L.M.C.L.Q. 167 (1977)
 
 
 [9]
 In its opinion the district court held that the alleged torts of misrepresentation and breach of duty "matured" at the time the acts constituting the torts are alleged to have been committed; that is, prior to the commencement of the salvage activity. By "matured," the court thus meant something distinct from consummated, acknowledging that no damages would have occurred at that point. As Bugsier points out, ordinarily a tort of any kind does not give rise to a cause of action unless and until the plaintiff has suffered harm of a kind legally compensable by damages. Because the damages incurred by plaintiffs-appellees could not be determined without an examination of the entire operation and its aftermath, we find unconvincing the district court's attempt to consider the asserted tort claims as separate from the salvage operation which is the subject matter of LSA
 
 
 [10]
 The district court found that the agreement was in effect at 1800 GMT, which was the time at which Amoco International confirmed the agreement in a telex to Bugsier's London agent. However, as all parties agree, the Cadiz had advised the Pacific of its acceptance of the LSA at 1600 GMT. Although the point is not critical to the disposition of this appeal, we conclude that the agreement became effective at the earlier time
 
 
 [11]
 See, e. g., Paragraph 3, plaintiffs' amended complaint