Robert ROBERSON and Ruby Roberson, Plaintiffs,

v.

The MONEY TREE OF ALABAMA, INC., et al., Defendants.

Civil Action No. 96–T–118–S.

United States District Court, M.D. Alabama, Southern Division.

Jan. 31, 1997.

Christian Edward Roberson, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, Donald P. McKenna, Taylor & Taylor, Birmingham, AL, for Plaintiffs.

C. Randal Johnson, George M. (Jack) Neal, Jr., Wilson F. Green, Sirote & Permutt, Birmingham, AL, for The Money Tree, Inc. of Alabama.

Robert William Bradford, Jr., Hill, Hill, Carter, Franco, Cole & Black, Montgomery, AL, for American Heritage Life Insurance Corporation.

Michael Lester Bell, Sara Anne Ford, John P. Dulin, Lightfoot, Franklin & White, L.L.C., Birmingham, AL, for American Bankers Life Assurance Company of Florida.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiffs Robert and Ruby Roberson originally filed suit against defendants The Money Tree of Alabama, Inc., American Bankers Life Assurance Company of Florida, and

American Heritage Life Insurance Corporation in state court, charging all defendants with fraud. The defendants removed this lawsuit from state to federal court based on diversity-of-citizenship jurisdiction, 28 U.S.C.A. §§ 1332, 1441. Money Tree and American Heritage were later dismissed, leaving only American Bankers as a defendant.

This lawsuit is now before the court on American Bankers' motion to compel arbitration and stay judicial proceedings pursuant to the Federal Arbitration Act (FAA), 9 U.S.C.A. §§ 1–16. For the reasons that follow, the motion will be granted.

## I. BACKGROUND

On four occasions from 1993 to 1995, the Robersons borrowed money from Money Tree. They allege that on each occasion they were told by the sales agent with whom they dealt that they were required to purchase credit insurance through American Heritage or American Bankers as a condition for approval of their loans. The Robersons originally filed suit against Money Tree, American Bankers, and American Heritage in the Circuit Court of Henry County, Alabama, alleging that all defendants, through their agents, misrepresented to plaintiffs that they would not qualify for consumer loans unless they purchased credit insurance and financed the insurance policies as part of their loans,

and so caused them to bear unnecessary and extreme costs. The Robersons further claim that defendants conspired with one another to commit fraud by suppressing information they were under a duty to reveal about the true conditions and requirements for obtaining loans.

On January 22, 1996, Money Tree removed this case to this court based on diversity-of-citizenship jurisdiction, and at the same time filed a motion to compel arbitration and stay judicial proceedings pursuant to the FAA. Money Tree relied on a "Pre-dispute Arbitration Agreement" in the loan contracts it had with the Robersons.[1] Both the removal petition and the motion to compel were joined by American Bankers on January 30, 1996, and by American Heritage on February 22, 1996. The Robersons opposed the motion to compel on February 21, 1996. While affording the parties ample opportunities to file briefs and memoranda of law, this court withheld ruling pending a decision in the Alabama Supreme Court on a group of cases on appeal from the Henry County Circuit Court presenting identical issues. However, those cases were subsequently settled and the Supreme Court never issued an opinion.

The complexion of this case changed on November 18, 1996, with the dismissal of Money Tree and American Heritage pursuant to a stipulation for pro tanto dismissal.

---

1. The "Pre–Dispute Arbitration Agreement" clause provides, in pertinent part, as follows:
   "ALL DISPUTES, CONTROVERSIES OR CLAIMS OF ANY KIND AND NATURE BETWEEN CREDITOR AND DEBTOR ARISING OUT OF OR IN CONNECTION WITH THE WITHIN AGREEMENT AS TO THE EXISTENCE, CONSTRUCTION, PERFORMANCE, ENFORCEMENT OR BREACH THEREOF SHALL BE SUBMITTED TO ARBITRATION PURSUANT TO THE PROCEDURES UNDER THE FOLLOWING PRE–DISPUTE ARBITRATION AGREEMENT:
   (A) ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS CONTRACT, OR THE BREACH THEREOF, SHALL BE SETTLED BY ARBITRATION IN THE STATE OF ALABAMA IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION (THE 'ARBITRATION RULES OF THE AAA'), AND JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR(S) MAY BE ENTERED IN

   ANY COURT HAVING JURISDICTION THEREOF.
   (b) The parties anticipate that the funds to be provided under this Agreement will come from sources outside the State of Alabama.. Therefore, Creditor and Debtor acknowledge and agree that the Contract involves "commerce" as defined in the United States Arbitration Act, Title VIII, United States Code, 'Arbitration,' hereinafter referred to as the 'USAA.'

   .  .  .  .  .  .

   (d) Notwithstanding any language in this Arbitration section to the contrary, under no conditions shall any dispute or controversy as to whether or not Debtor has committed an act of default with respect to the items of default enumerated ... be subject to arbitration in the manner set forth herein. On the contrary, such disputes or controversies are non-arbitrable and may only be determined in an action filed in a court of competent jurisdiction, at law or in equity, or therewise as provided by law...."

Thus, the only remaining defendant in this action is American Bankers.

## II. DISCUSSION

The Robersons argue that they should not be compelled to arbitrate their claims against American Bankers for several reasons. First, they claim that the FAA does not apply to their loan agreement because the agreement does not, in fact, concern interstate commerce. Next, they argue that the loan agreement, or at least the arbitration clause within it, should not be honored because it is adhesive and unconscionable. Finally, they contend that American Bankers has no standing to compel arbitration since it is not a party to and has no rights under the loan agreement in which the arbitration clause appears.

### A. Applicability of the FAA

The Robersons first argue that the loan agreements they signed with Money Tree, which on several occasions included and incorporated credit insurance contracts with American Bankers, were entirely intrastate in nature and that therefore the FAA does not apply to them.

The FAA makes enforceable a written arbitration provision in "a contract evidencing a transaction involving commerce." 9 U.S.C.A. § 2.[2] The FAA defines "commerce" as "commerce among the several states." 9 U.S.C.A. § 1. Thus, the first question in this case is whether the transaction at issue is one "involving commerce" within the meaning of the FAA.

In *Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, ——, 115 S.Ct. 834, 841, 130 L.Ed.2d 753 (1995), the United States Supreme Court instructed that "the word 'involving' … signals an intent to exercise Congress's commerce power to the full," and that the phrase " 'evidencing a transaction' mean[s] only that the transaction … turn[s] out, *in fact,* to have involved interstate commerce.[3]" (Emphasis added.)

In the contracts between the Robersons and Money Tree, this requirement has been met. The evidence before the court reflects the following: Money Tree is a Georgia corporation; although the Robersons' loans were negotiated in Alabama, all loans, including theirs, were approved from a centralized loan approver in Georgia; although the notes and loan confirmation forms were signed in Alabama, all original loan notes, including theirs, were produced in and shipped from Georgia; the loan proceeds were wired from Georgia and then disbursed to the Robersons in Alabama; all supplies for the Alabama Money Tree office were shipped from Georgia; and all loan documents were printed in Georgia. The transactions between the Robersons and Money Tree were ones "involving commerce" within the meaning of the FAA. *See, e.g., Staples v. The Money Tree,* 936 F.Supp. 856, 858–59 (M.D.Ala.1996) (Thompson, J.); *see also Williams v. Katten, Muchin & Zavis,* 837 F.Supp. 1430 (N.D.Ill.1993); *Pioneer Properties, Inc. v. Martin,* 557 F.Supp. 1354 (D.Kan.1983); *First Citizens Mun. Corp. v. Pershing Div. of Donaldson, Lufkin & Jenrette Sec. Corp.,* 546 F.Supp. 884 (N.D.Ga. 1982).[4]

---

**2.** Section 2 provides:
"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

**3.** In *Allied–Bruce,* the Supreme Court rejected Alabama's "contemplation of the parties" test, and held that the "commerce in fact" test "is

more faithful to the [FAA]." 513 U.S. at ——, 115 S.Ct. at 840.

**4.** Moreover, the contract between the Robersons and Money Tree expressly provides that, "Creditor and Debtor acknowledge and agree that the Contract involves 'commerce' as defined in the United States Arbitration Act," and thus they have essentially agreed that the FAA applies. In *Volt Info. Sciences v. Board of Trustees,* 489 U.S. 468, 479, 109 S.Ct. 1248, 1256, 103 L.Ed.2d 488, the Supreme Court wrote that courts should " 'rigorously enforce' [arbitration] agreements according to their terms." Because "[a]rbitration under the Act is a matter of consent, not coercion," 489 U.S. at 479, 109 S.Ct. at 1256,

### B. Unconscionability of Loan Agreement and/or Arbitration Clause

The Robersons' next argument is that the loan agreement, or at least the pre-dispute arbitration agreement component of it, is an unconscionable contract of adhesion and should not be enforced.[5] They claim that they were offered no meaningful choice or opportunity to negotiate the terms of their loans, and that they did not understand and were not given to understand the significance of those terms, and of the arbitration clause in particular. The core of their argument, however, is that because the pre-dispute arbitration agreement requires them to arbitrate any claim against Money Tree, while explicitly reserving for Money Tree the right to seek judicial remedies in the eventuality of default by the Robersons, the agreement is oppressively, and therefore unconscionably, one-sided.

The Robersons point out that the FAA does not require the enforcement of an arbitration provision where it is invalid "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. The Supreme Court has confirmed that § 2 "gives States [ ] method[s] for protecting consumers against unfair pressure to agree to a contract with an unwarranted arbitration provision" both in equity and under principles of contract law. *Allied–Bruce*, 513 U.S. at ——, 115 S.Ct. at 843. The Alabama Supreme Court has also recognized that a finding that an arbitration clause is an unjust and unreasonable contract of adhesion might be grounds not to enforce that clause under the FAA. *See Ex parte Merrill Lynch,*

*Pierce, Fenner & Smith,* 494 So.2d 1, 4 (Ala. 1986).

■ Moreover, Alabama statutory law empowers a trial court essentially to modify a consumer finance or credit contract, the provisions of which it finds as a matter of law to be unconscionable. The Alabama Code Mini–Code, 1975 Ala.Code § 5–19–16, provides that, "With respect to a consumer credit transaction, if the court as a matter of law finds the contract or any provision of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable provision, or it may so limit the application of any unconscionable provision as to avoid any unconscionable result." The language of this section mirrors a provision in the sale of goods chapter of the Alabama Commercial Code, 1975 Ala.Code § 7–2–302(1), governing consumer sales.[6] *See, e.g., Cleveland Ins. Agency, Inc. v. Redshaw, Inc.,* 524 So.2d 367, 369 (Ala.Civ.App.1987) (finding contract not unconscionable where both parties were sophisticated corporate entities who negotiated the contract over several months); *Lloyd v. Service Corp. of Alabama, Inc.,* 453 So.2d 735, 739–40 (Ala.1984) (applying § 7–2–302 by analogy to find clauses waiving landlord tort liability in residential leases unconscionable).

■ However, it would be difficult for a court to decide this issue 'as a matter of law' because "Alabama law provides no implicit standard of unconscionability.[7] Each case

---

and because "parties are generally free to structure their arbitration agreements as they see fit," *id.,* courts must "give effect to the contractual rights and expectations of the parties." *Id.* The Court explained that "the FAA's primary purpose" is "ensuring that private agreements to arbitrate are enforced according to their terms." *Id.* at 478, 109 S.Ct. at 1255. Here, because the Robersons and Money Tree have essentially stipulated that the FAA applies, the court must, and will, enforce the stipulation and apply the FAA to the arbitration agreement contained in the contract.

5. *See supra* note 1.

6. Section 7–2–302(1) provides that "(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconsciona-

ble at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

7. This definitional haziness is not endemic to Alabama law, but rather derives from the Uniform Commercial Code, also known as the U.C.C., which declines to define the term unconscionability. U.C.C. § 2–302; William D. Hawkland, Uniform Commercial Code Series, 2–302:01 (1984) ("the meaning of the word 'unconscionable' is not clear"); Duesenberg & King, Sales and Bulk Transfers under the U.C.C., § 4.08[2][c] ("[N]owhere does … the Code attempt a definition of 'unconscionable'. Nothing

must be decided on its own facts." *E & W Bldg. Material v. American Sav. & Loan Ass'n,* 648 F.Supp. 289, 290 (M.D.Ala.1986) (finding loan contract not unconscionable where sophisticated and knowledgeable borrower was not "taken in" by a party possessing vastly superior knowledge and experience). Generally, under Alabama case law, "unconscionability includes an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party. *West Point–Pepperell, Inc. v. Bradshaw,* 377 F.Supp. 154 (M.D.Ala.1974). Few Alabama cases address the issue, but at least one case holds that it is the unequal bargaining power of the parties that gives rise to an unconscionable contract. *Lloyd v. Service Corp.,* 453 So.2d 735 (Ala.1984)." *The Advertiser Co. v. Electronic Eng'r, Inc.,* 527 So.2d 1317, 1320 (Ala.Civ.App.1988). *See also Taylor v. Leedy & Co., Inc.,* 412 So.2d 763, 765–66 (Ala.1982) (factors bearing on the issue of whether a contract should not be enforced because unconscionable include the bargaining power of the parties, the availability of meaningful choices, and whether the provisions unreasonably favor one party). While it may be easy to say that the Robersons had virtually no bargaining power and that meaningful choices were unavailable to them, the court cannot conclude that the contract terms at issue were unreasonably unfavorable to them. In other words, the Robersons have not identified what it is that they have lost in their contract that is so patently unfair and unreasonable as to be unconscionable.

■■■ The Alabama Supreme Court has also defined an unconscionable contract as one " 'such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.' " *Layne v. Garner,* 612 So.2d 404, 408 (Ala.1992) (quoting *Hume v. United States,* 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889)). Stating the standard in this

manner may be overly exacting, and thus impossible of proof. Yet, at a minimum, a party cannot rely on an abstract principle or theory of unfairness of a bargain to make a case for unconscionability; it must still be gauged by the actual circumstances of the case, and not in the abstract. Therefore, this court will still pose the question: what *exactly* have the Robersons unwillingly or unwittingly sacrificed or lost in this contract that is so patently unfair and unreasonable as to be unconscionable?

■■■ The Robersons present financial figures to demonstrate that, considering the allegedly unwanted and unnecessary insurance premiums as part of their loan charges, they were paying between 70 and 150% interest on their small consumer loans. They reference a group of consolidated cases in the Circuit Court of Henry County, Alabama, *Sampson v. The Money Tree,* Civil Action Nos. 95–031, 95–032, 95–033 (Oct. 23, 1995), where the judge, looking at virtually identical loan agreements with comparable principal amounts and interest (and other) charges, found that the plaintiffs must have been desperate, unsophisticated and uninformed, and therefore could not have knowingly agreed to waive their right to jury trial. The judge therefore ruled against enforcement of the pre-dispute arbitration clauses in their loan agreements. These cases were appealed to, but settled before decision from, the Alabama Supreme Court.

The precise question in this case, however, is whether the arbitration clause is so unfavorable to the Robersons that it simply would not have been reasonable for them knowingly to accept it, given any meaningful choice. What the Robersons have not demonstrated to the court is that resolving their claims against Money Tree or the other defendants through arbitration significantly deprives them of remedies for the wrongs they feel they have undergone. In other words,

whatsoever of the term's content can be learned from a reading of [section 2–302], and very little more from a study of its official comments."). Some jurisdictions have articulated a distinction between procedural (bargaining process) and substantive (fairness) unconscionability, *see, e.g., World Enters., Inc. v. Midcoast Aviation Servs., Inc.,* 713 S.W.2d 606 (Mo.App.1986), while oth-

ers have attempted to enumerate a list of usual factors that would be found in and surrounding unconscionable contracts. *See, e.g., John Deere Leasing Co. v. Blubaugh,* 636 F.Supp. 1569 (D.Kan.1986) (10 elements, including use of pre-printed forms on take it or leave it basis, excessive price, denial of basic rights and remedies, obfuscatory language, etc.).

the Robersons have not shown that the fact that they must pursue arbitration even discriminates (unfairly or fairly) against them. For example, they have not shown that they cannot obtain through arbitration the very same relief that would be otherwise available in a court action.

This case is unlike *Lloyd,* which involved outright waivers of landlord liability for the commission of certain torts. The Robersons have not argued that an arbitrator cannot hear liability claims against the defendants or cannot award the full panoply of relief available in state courts under Alabama law.[8] Nor have they shown in any way that the arbitration clause itself is serving or being used as a license to engage in usurious or oppressive lending practices through waiver of liability for intentional torts, such as fraud or intentional misrepresentation. Without such showings, the court cannot say that requiring the Robersons to make their case within an arbitral forum is inherently oppressive or unreasonably unfavorable to the Ro-

bersons. A court must be wary of finding a contract unconscionable where the plaintiff is "left with some place to go," *cf. Ex Parte Merrill Lynch,* 494 So.2d at 4 ("plaintiff has failed to present this Court with any reasons why we should presume that an unjust result will necessarily occur [from being forced to use arbitrator of defendant's choice]"), because denial of a specific remedy or forum is substantively different from denial of any means of enforcement whatsoever. *In re Elkins–Dell Mfg. Co.,* 253 F.Supp. 864 (E.D.Pa.1966). Furthermore, "[T]o prove unconscionability there must be a showing, not only that the terms of the contract are onerous, oppressive, or one-sided, but also that the terms bear no reasonable relation to the business risks." *Id.* at 873.[9] The Robersons have made no such showing.[10]

## C. *Applicability of Arbitration Clause to American Bankers*

The Robersons finally argue that, even if the arbitration clause would have been bind-

---

**8.** The court therefore does not have before it whether a contract that not only requires the borrower to arbitrate any claim, while reserving for the lender the right to seek judicial remedies in the eventuality of default, but also restricts the borrower's range of relief in arbitration, is unconscionable.

**9.** This observation also grows out of Comment 1 to U.C.C. § 2–302, which states that the 'principle (of unconscionability) is one of the prevention of oppression and unfair surprise, and not of disturbance of allocation of risks because of superior bargaining power.'

**10.** The Robersons further suggest that if a contract is adhesive it is unconscionable as well. The court cannot agree. Although courts sometimes speak loosely and equate adhesion contracts with unconscionable ones, the former term may refer simply to agreements in which one party has virtually no voice in the formulation of their terms and language. 1 Corbin on Contracts § 1.4 (Rev.Ed.1993). "The contract of adhesion is a part of the fabric of our society. It should neither be praised nor denounced...." *Id.* That is because there are important advantages to its use despite its potential for abuse. These advantages include the fact that standardization of forms for contracts is a rational and economically efficient response to the rapidity of market transactions and the high costs of negotiations, and that the drafter can rationally calculate the costs and risks of performance, which contributes to rational pricing. *Id.* Even critics acknowledge that "contracts of adhesion, like

negotiated contracts, are prima facie enforceable as written." Todd D. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction,* 96 Harv. L.Rev. 1173, 1176–77 (April 1983). Rakoff constructs a model of a typical adhesion contract as one where:

"(1) The document whose legal validity is at issue is a printed form that contains many terms and clearly purports to be a contract. "(2) The form has been drafted by, or on behalf of, one party to the transaction. "(3) The drafting party participates in numerous transactions of the type represented by the form and enters into these transactions as a matter of routine. "(4) The form is presented to the adhering party with the representation that, except perhaps for a few identified items (such as the price term), the drafting party will enter into the transaction only on the terms contained in the document. This representation may be explicit or may be implicit in the situation, but it is understood by the adherent. "(5) After the parties have dickered over whatever terms are open to bargaining, the document is signed by the adherent. "(6) The adhering party enters into few transactions of the type represented by the form— few, at least, in comparison with the drafting party. "(7) The principal obligation of the adhering party in the transaction considered as a whole is the payment of money." *Id.*

ing as to Money Tree, they never agreed to arbitrate any disputes with American Bankers.

█ There is one very important point that often gets neglected in any discussion of nonsignatories and arbitration clauses that must be made clear: There are instances, and cases, where nonsignatories to arbitration clauses may be equitably compelled to pursue their claims against a defendant in arbitration. *See, e.g., In re Oil Spill by Amoco Cadiz,* 659 F.2d 789, 796 (7th Cir. 1981) (plaintiff who invokes the doctrine of agency to gain standing to assert a claim against a defendant cannot later disavow an arbitration clause in the contract between its agent and the defendant); *Dunn Const. Co. v. Sugar Beach Condominium Ass'n,* 760 F.Supp. 1479 (S.D.Ala.1991) (party seeking status under contract as third-party beneficiary is estopped from later renouncing that status in order to prevent a party to the contract from compelling it to arbitrate a claim); and there are cases where, in general, ordinary contract and agency principles demand that nonsignatories be bound by arbitration clauses. *See Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir.1995) (presenting a list of common law contract and agency principles under which nonparties to arbitration clauses may be bound to arbitration agreements of others, but distinguishing these from cases where nonparties seek to bind parties to contractual arbitration clauses); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,* 7 F.3d 1110, 1121 (3rd Cir.1993) (principal and agent should both be bound to an arbitration agreement entered into by one of them when charges against both are based on the same facts and are inherently inseparable).

But such cases, as *Thomson–CSF* points out, differ from ones where nonsignatories themselves seek standing to compel signatories to arbitrate claims with them. *See, e.g., J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320–21 (4th Cir.1988) (charges against parent company based on same facts as claim against subsidiary, with whom arbitration agreement is in effect, may be referred to arbitration also); *Arnold v. Arnold Corp.,* 920 F.2d 1269, 1281 (6th Cir.

1990) (nonsignatory defendant, as agent of signatory defendant, may compel arbitration); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.,* 741 F.2d 342 (11th Cir.1984) (equitable estoppel allows nonsignatory defendant to compel arbitration); *Sam Reisfeld & Son Import Company v. S.A. Eteco,* 530 F.2d 679, 681 (5th Cir.1976) (nonsignatory defendants could stay judicial proceedings where charges against [signatory and nonsignatory] defendants were based on the same operative facts and were inherently inseparable); *Britton v. Co-op Banking Group,* 4 F.3d 742, 744 (9th Cir.1993); *A.L. Williams & Assoc., Inc. v. McMahon,* 697 F.Supp. 488, 494 (N.D.Ga.1988).

█ In other words, the situation when a party seeks to compel a nonparty to arbitration differs from a situation where a nonparty is seeking to compel a party. In the former instance, the party already has rights under the arbitration clause and is seeking to enforce them more broadly. In the latter, the nonparty must first, as a threshold, establish grounds, in law or equity, why it should be permitted to assert rights under a contract to which it is NOT a party.

This distinction appears to be the basis for the Alabama Supreme Court's ex mero motu revision and reversal of its own opinion in the case of *Ex Parte Jones,* 686 So.2d 1166 (1996). There the court asserts that an insurance company whose policy was sold as part of a loan agreement with Money Tree, in order to secure the loan, has no standing to compel arbitration in a suit brought against them and Money Tree. The insurer is not a party to the arbitration clause of the loan agreement itself between the creditor (Money Tree) and the debtor, and the debtor never contractually agreed to arbitrate claims against the insurer, since the separate insurance document contained no arbitration provision.

█ There is clear support for this line of analysis. The "primary purpose" of the FAA is to ensure "that private agreements to arbitrate are enforced according to their terms." *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248,

1255–56, 103 L.Ed.2d 488 (1989). "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their agreements as they see fit." *Id.* It is a cardinal principle of federal arbitration law that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navig. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)).

It is the court's task, unless the parties have explicitly agreed otherwise, to determine whether an agreement to arbitrate exists between parties. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, ——, 115 S.Ct. 1920, 1923–25, 131 L.Ed.2d 985 (1995). In making this determination, the court should apply ordinary state common law governing the formation of contracts, with due regard for the federal policy favoring arbitration. *Volt Info. Sciences,* 489 U.S. at 475–76, 109 S.Ct. at 1254; *see also Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, —— & n. 9, 115 S.Ct. 1212, 1219 & n. 9, 131 L.Ed.2d 76 (1995). However, only state laws that are applicable to contracts generally may be applied to arbitration agreements; a state law that singles out arbitration agreements for disfavored treatment is displaced by the FAA. *Doctor's Assocs., Inc. v. Casarotto,* —— U.S. ——, ——, 116 S.Ct. 1652, 1655–56, 134 L.Ed.2d 902 (1996); *see also Allied–Bruce,* 513 U.S. at ——, 115 S.Ct. at 843 (states may regulate contracts, including arbitration clauses, under general contract law principles, but may not single out arbitration clauses for disfavor); *First Options of Chicago,* 514 U.S. at ——, 115 S.Ct. at 1924 (state law generally governs the determination of whether the parties agreed to arbitrate a certain matter).

It is almost axiomatic, as a first rule of contract law, that parties must manifest assent to a bargain in order to be bound under it. *See* Restatement (Second) of Contracts § 17. Hence, under state common law as well, a party who has not agreed to do so

may not be required to submit to arbitration. *AT & T Technologies,* 475 U.S. at 648, 106 S.Ct. at 1418; *Old Republic Ins. Co. v. Lanier,* 644 So.2d 1258, 1260 (Ala.1994). Beyond that, also as a general matter, one "who is not a party to a contract has no standing to compel arbitration." *Britton,* 4 F.3d 742 at 744; *Ex Parte Stallings & Sons, Inc.,* 670 So.2d 861, 862 (Ala.1995). The view expressed in the Alabama Supreme Court in its *Jones* opinion appears to be guided by an exclusive focus on such general principles of contract formation and enforcement. *Jones,* 686 So.2d at 1167–68.

Although the Joneses presented claims alleging fraudulent actions by the defendants working in concert, the Alabama Supreme Court in *Jones,* as the dissent noted, did not consider any of the traditional exceptions, such as agency or estoppel, whereby nonsignatories may seek enforcement of arbitration clauses in agreements signed by parties that sue them. *Jones,* 686 So.2d at 1168–70 (Maddox, J., dissenting). It is therefore very hard to determine what the true scope of the *Jones* decision is, and how it can or should be distinguished from cases, such as the Eleventh Circuit Court of Appeals' decision in *McBro,* decided on principles of equitable estoppel or agency.

*McBro* is a paradigmatic example of a case where equitable estoppel properly applies. There, a manager and a contractor each had a contract with a hospital to work on a construction project. Both contracts contained arbitration clauses. A dispute broke out between the contractor and the manager, who had no contract between them. The court ruled that the dispute had to be arbitrated because the duties the contractor claimed were breached by the manager were duties that arose under the contractor's contract with the hospital. The assignment of duties under that contract was the basis for the lawsuit; thus the other conditions of the contract applicable to disputes, including the arbitration clause, had also to be given effect. The Eleventh Circuit stated that the dispute between the parties to the litigation was "intimately founded in and intertwined with the underlying contract obligations." *McBro,* 741 F.2d at 344 (quoting *Hughes*

*Masonry Co. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836, 841 n. 9 (7th Cir.1981)). The scenario in *Hughes* was almost identical.

■■■■ In the instant case, the complaint alleges that some unidentified persons acted as agents of Money Tree and the insurance companies in selling unnecessary insurance. The complaint is vague about whether American Bankers is itself alleged to be the principal of Money Tree, or vice versa. But the complaint also further alleges that all the defendants cooperated in a fraudulent scheme to sell them unnecessary insurance through various suppressions and misrepresentations. Thus, at least some of the claims against defendants were closely intertwined and arose in connection with the loan agreement itself. The Robersons' theory that the defendants acted together to establish a scheme to fraudulently load unnecessary and expensive insurance policies onto high-interest consumer loan agreements gives rise to a set of complaints about their contract obligations that implicate all defendants inseparably. Thus, the claims against each defendant are "intimately founded in and intertwined with the underlying contract obligations." *McBro*, 741 F.2d at 344 (quoting *Hughes*, 659 F.2d at 841 n. 9); *cf. Mutual Ben. Life Ins. Co. v. Zimmerman*, 783 F.Supp. 853, 868 (D.N.J.1992) (tort claims against third party not intertwined with underlying contract so no estoppel grounds to compel arbitration).

In this respect, this case is virtually indistinguishable from *Staples v. The Money Tree, Inc.*, 936 F.Supp. 856 (M.D.Ala.1996), where the plaintiff sued both Money Tree, who was the lender, and two insurers of the loan collateral, for scheming together to load her with unnecessary and excessive charges. The insurers sought to join the lender's motion to compel arbitration under the terms of the loan agreement. The plaintiff's "claims against [the insurers were] deriva-

tive of, and predicated on, her claims against Money Tree; if she [had] no claim against Money Tree, she [had] no claim against [the insurers]." *Id.* at 859. This court therefore concluded that Staples's claims against the insurers were intimately founded on and intertwined with the underlying contract obligations.

The fact that the other defendants have been released from this lawsuit has no bearing on the theory of the Robersons' case. They are still suing on the contracts formed with Money Tree and the insurers, regardless of whether or not they can still pursue their claims against and seek damages from every one of those defendants. A party to an agreement should be equitably estopped from suing a nonsignatory in court when the very basis of the party's claim against the nonsignatory is that the nonsignatory breached the duties and responsibilities assigned to it by the party's agreement with the other signatory party, which agreement was governed by an arbitration clause.

Admittedly, to warrant equitable estoppel, it is not enough that the plaintiff be in a position to raise similar and parallel claims against both the other party to the contract and the third party. Therefore, it is irrelevant whether or not claims are indeed raised against both parties. What is necessary is that the claim against the nonsignatory be inextricably bound up with the terms and duties of the contract the plaintiff has signed with the other defendant. *See McBro*, 741 F.2d at 344. The Robersons, alleging common breaches of duties by all defendants working hand-in-hand, are therefore equitably estopped from asserting that the lack of a separate written arbitration agreement between themselves and American Bankers prevents American Bankers from compelling them to arbitrate according to the terms of the pre-dispute arbitration agreement in the loan contract.[11]

An appropriate judgment will be entered.

---

11. The Robersons also charge that American Bankers entered into a conspiracy with Money Tree to defraud them and others. A civil conspiracy is a kind of partnership, in which each member becomes the agent of the other. *Reno–West Coast Distribution Co., Inc. v. Mead Corp.,*

613 F.2d 722, 725 n. 3 (9th Cir.), *cert. denied,* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 183 (1979). To the extent American Bankers could be considered an agent of Money Tree, it is entitled to arbitration under the laws of "agency." In *Pritzker,* the Third Circuit Court of Appeals held that

*JUDGMENT AND INJUNCTION*

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The motion to stay judicial proceedings and compel arbitration, filed by defendant American Bankers Life Assurance Company of Florida on January 30, 1996, is granted.

(2) Plaintiffs Robert and Ruby Roberson are ENJOINED and RESTRAINED from failing forthwith to arbitrate their claims against defendant American Bankers Life Assurance Company of Florida.

It is further ORDERED that costs are taxed against the Roberson plaintiffs, for which execution may issue.

DONE, this the 31st day of January, 1997.

"because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." 7 F.3d at 1121. That a principal and an agent should both be bound to an arbitration agreement entered into by one of them becomes even more evident when the charges against the principal and its agent are based on the same facts and are inherently inseparable. *See also Staples,* 936 F.Supp. at 860.